[No. B184623. Second Dist., Div. Eight. July 3, 2006.]

JOHN SINGLETON, Plaintiff and Appellant, v.
UNITED STATES GYPSUM COMPANY, Defendant and Respondent.

1548

## COUNSEL

Stephen A. Ebner; and Kevin C. Boyle for Plaintiff and Appellant.

Davis & Campbell, Keith J. Braskich; and Carol L. Newman for Defendant and Respondent.

## OPINION

**FLIER, J.**—Appellant John Singleton, a maintenance mechanic employed by respondent United States Gypsum Company (USG), filed an action alleging sex discrimination and harassment in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). The trial court granted USG's motion for summary judgment. We find that whether Singleton was subjected to sexual harassment depends on the resolution of material issues of fact and reverse the judgment for that reason.

### FACTS

USG owns and operates a manufacturing plant in Torrance. Singleton was hired by USG in February 2002 in the engineering department as a maintenance mechanic to repair production equipment.[1] Singleton initially worked the day shift. After four or five months he was moved to the evening, graveyard shift and was the only mechanic on duty during this shift.

---

[1] Unless we note and describe the dispute, the facts stated in our opinion are not disputed.

Singleton admitted that he received USG's "Quality of Life" policy during orientation, which states, in part, that harassment was prohibited and that an employee should "promptly and accurately" report such behavior to his or her supervisor.

On December 20, 2002, Jonathan Rank, a USG employee, gave a written statement to USG that he heard Singleton state: "[I]f we work on Christmas that [*sic*] he was going to come in here with a gun and shoot everybody except Sandy." The same day, USG employee Christopher Horton provided a written statement that he heard appellant say that Singleton was going to "bring a gun and start shooting people he did not like."

Singleton does not dispute that Rank gave this statement. However, Rank testified that he, Rank, was laughing when Singleton made this statement, that he did not believe that Singleton was a threat, nor was he afraid of Singleton. Horton testified likewise.

Upon hearing of these statements, USG suspended Singleton on December 20, 2002. Singleton denied making the statements in question. However, he did admit in his deposition that, when he was angry about possibly having to work on Christmas, he said, "now I know why some people go postal."

Gregory Ward, USG's plant manager, decided to terminate Singleton because of the threatening statements that appellant made on December 20, 2002. Ward terminated Singleton as of December 27, 2002.

On December 20, 2002, Singleton submitted a written statement to USG in which he related that USG employees Lawrence Umi and Kevin Ross had repeatedly called him "Sing-a-ling," which, according to appellant, was a reference to a homosexual character played by actor Bernie Mac in the movie Life (Universal Studios 1999). Also according to appellant's December 20th statement, Umi challenged appellant to meet him in the parking lot after work.

Ross resigned from employment at USG on November 10, 2002, and Umi was terminated by Ward on December 31, 2002. The reason for Umi's termination, according to Ward, was that Umi had engaged in a pattern of confrontational behavior that culminated in the confrontation with appellant.

Although Singleton's December 20, 2002 written statement made no mention of acts of harassment other than being called "Sing-a-ling," Singleton claims that Ross and Umi made a series of other statements that constituted

harassment based on sex.[2] What, if anything, Umi and Ross actually said in addition to calling Singleton "Sing-a-ling" is sharply disputed. According to Singleton's deposition testimony, beginning on September 19, 2002, Ross "would say things that I would say challenged me as a man, for one thing. He would say things like I got on tight jeans today. What you got on, G string something, like that. [¶] He [Ross] would refer to—with his little crew he had there, every evening, every morning when my supervisor would come in he would always walk out to a silo or something of that sort in the back, and he [Ross] would make gestures as far as I was out there performing oral sex and things of that sort to my supervisor and just a lot of negative, negative comments." In addition, Singleton testified that Ross made comments about "[m]e performing oral sex on my supervisor, his screwing me in the behind out in the silo, me performing oral sex on himself, just one thing after another." Singleton stated that these kinds of comments were made continuously, every night.

According to Singleton, Umi told him that "he would hold my hair and screw from behind. He would hold my hair and f— me in the a—." "I'll [Umi] take you out to the silo, too, and you can perform oral sex on me." In addition, Umi "also made statements that I was having oral sex on my supervisor in the mornings out by the silo. That's why I was still employed by USG." According to Singleton, these comments were made every night.[3]

USG disputes that Ross and Umi made any of the comments described by Singleton. USG relies on Ross's and Umi's testimony and declaration in which they denied making these comments.

Early in his employment at USG, Singleton told a coworker that his nickname in the Navy had been "Sing." Ross learned of this nickname, and then made up the name "Sing-a-ling" for Singleton. After Ross left USG, Umi would use it. Singleton thought that "Sing-a-ling" was intended to refer to a character in the movie Life, who was a homosexual whose male partner was called "Ding-a-ling." Singleton testified that Umi called him by this name every night.

USG employee Horton testified at his deposition that Ross and Umi called Singleton by his nickname, presumably "Sing-a-ling," on a daily basis and that he, Horton, believed that the nickname was sexual in nature; Horton thought that the name referred to Singleton's genitals. Rank also corroborated that workers called Singleton by a nickname and that the name referred to a character in the movie Life.

---

[2] It is not disputed that, according to Singleton, only Umi and Ross made the comments discussed in the text, post, at pages 1552–1553.

[3] Another derogatory comment by Umi, but not of a sexual nature, was that Singleton was the "best [B]lack mechanic" at USG; Singleton was the only Black mechanic.

Singleton testified that, as a result of Ross's and Umi's comments and taunting, work became a "living hell," and that his performance was adversely affected.

USG disputes that the nickname "Sing-a-ling" was ever used by Ross and Umi. In addition, USG points to Singleton's testimony that Singleton never did anything about the use of this nickname, that there was no character by that name in the movie Life, and that there is nothing to show that the use of "Sing-a-ling" was intended to convey the suggestion that Singleton is a homosexual.

Singleton testified that he frequently complained to his supervisors about Ross's and Umi's comments about sex and sexual activity, as well as use of the nickname "Sing-a-ling." Singleton testified that he told his supervisor Thyfaut that Ross had made sexual gestures and made sexually explicit remarks that Singleton did not "appreciate." In response, Thyfaut told Singleton "[j]ust do your job and if you have any problem[s], let me know." Singleton brought this subject up again with Thyfaut, but Thyfaut, according to Singleton, did not say anything.

Singleton also complained to Sam Mafia and Fred Uiato, who were production supervisors on the graveyard shift, about the sexual comments made by Ross and Umi. Mafia and Uiato responded by saying: "Just tell him 'f— you' and keep on working, John." Singleton testified that he complained every night to Mafia or Uiato about Ross's and Umi's comments.

Singleton also testified that he told USG department manager Terrance Evans about the verbal abuse of being called "Sing-a-ling" "all night" and "constantly." Evans replied by saying: "Just ignore them and do your job."

USG disputes the claim that Singleton informed his supervisors about the comments made by Ross and Umi.

At some point in time, machines used in the graveyard shift began to fail and malfunction. USG supervisor Thyfaut believed that production workers on the graveyard shift were tampering with the machines since there was no other explanation for the malfunctioning machinery. As a part of this problem, the tensions between Singleton and Ross appear to have had their start in September 2002 when Singleton complained about Ross. At this point, the subject of this complaint is not known. Ross confronted Singleton on September 20, 2002, calling him a variety of vulgar names for having reported him to management. Singleton described the confrontation in a written statement of the same date. The statement closed with the comment: "I would welcome anyone to come to this plant at 2:00 am or 4:00 am to see what is really going on."

Singleton thought that Ross was making the abusive comments to him because Singleton had complained to management about Ross sabotaging equipment, because Singleton had challenged Ross's knowledge of USG equipment, because Ross was (generally) an "a—h—," because Singleton was an Oakland Raider fan, and because Ross's father worked at USG and Ross thought he could do what he wanted. As far as Umi was concerned, Singleton thought that Umi was going along with Ross, who was one of his cronies.

## THE TRIAL COURT'S RULING

Singleton's complaint alleged four causes of action. The first cause of action was based on sex discrimination and the second on sexual harassment in violation of FEHA. The third cause of action was predicated on USG's alleged failure to take reasonable steps to prevent sex discrimination and harassment, also in violation of FEHA. The fourth cause of action alleged that USG had unlawfully retaliated against Singleton for his opposition to the acts of sex discrimination and harassment.

The trial court first found that USG had made a prima facie showing that Singleton's employment was terminated for a legitimate, nondiscriminatory reason. That reason was that Singleton's statements, as reported by Rank and Horton on December 20, 2002, threatened physical violence.

The trial court then went on to note that Singleton's claim was that he was "regularly insulted by words and gestures of a sexual nature which he [Singleton] found demoralizing. This court concludes that the undisputed evidence demonstrates as a matter of law that none of the harassing behavior about which plaintiff complained is sex discrimination or sex harassment, for the reasons set forth below."

As far as Ross's comments are concerned, the trial court focused on the altercation between Singleton and Ross that erupted on September 20, 2002, as a result of Singleton's report to management about Ross. The court concluded that this altercation, while liberally sprinkled with vulgarities, did not contain any sexual elements or overtones. The trial court acknowledged that, in addition to this altercation, Singleton reported to supervisor Thyfaut that Ross had "made sexual gestures and sexually explicit remarks that he [Singleton] found offensive but he admitted that he 'didn't go into any specifics as far as what was actually said.' " As we discuss below, this last finding was in error.

As far as Umi's comments were concerned, the trial court noted that Singleton testified that he asked Mafia and/or Uiato to tell Umi to " 'stop sex

playing me.' " The court went on to find that: (1) Singleton did not make this complaint to his own supervisor; (2) Singleton did not explain what he meant by the term "sex playing;" and (3) that words have sexual content or connotations does not, standing alone, constitute harassment. This finding is also erroneous. (See text, *post*, at pp. 1557–1558.)

As far as use of the name "Sing-a-ling" was concerned, the trial court found that it was undisputed that only Singleton attributed the name to a homosexual character in the movie Life. The court went on to find: "Even if the graveyard shift workers intended to taunt plaintiff with a nickname having a sexual component, sex-based ridicule and insult rises to the level of actionable discrimination or harassment only if it is so extreme as to create an environment that an objectively reasonable person would find hostile or abusive." We agree with the court's general observations, but do not agree with the court's application of these observations to the case at bar.

The court concluded: "Plaintiff has presented substantial evidence that graveyard shift production workers insulted him, spoke rudely to him, interfered with his maintenance work, deliberately sabotaged machine operations and taunted him while he tried fruitlessly to troubleshoot problems and get the machinery operating again. Such behavior by the nonsupervisory employees was hostile and abusive, but there is no triable issue of fact that the hostility or abuse was related to plaintiff's gender or sexual orientation. It is therefore not protected by FEHA."

Singleton's claim for sex discrimination was based on the acts of alleged sexual harassment. Thus, the trial court's conclusion that no sexual harassment had taken place disposed of the first and second causes of action. The trial court's conclusion that no sexual harassment had taken place also disposed of the third and fourth causes of action, since, in light of this conclusion, there was nothing that USG was required to prevent (third cause of action) and nothing for which USG could have retaliated (fourth cause of action).

## DISCUSSION

██ Singleton bases his case on the FEHA provision found in Government Code section 12940, subdivision (j), which, in relevant part, prohibits an employer from harassing an employee because of sex or sexual orientation. Subdivision (j)(1) of section 12940 also provides: "Harassment of an employee, an applicant, or a person providing services pursuant to a contract by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action."

We turn to *Mogilefsky v. Superior Court* (1993) 20 Cal.App.4th 1409 [26 Cal.Rptr.2d 116] (*Mogilefsky*), a leading case in California on "same-gender" sexual harassment. (See 8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 930 (Same-Gender Harassment), pp. 437–438, citing and discussing *Mogilefsky*.) We agree with the well-considered reasoning of the court in *Mogilefsky* that sexual harassment in violation of Government Code section 12940 "may be stated by a member of the same sex as the harasser." (*Mogilefsky, supra*, at p. 1418; cf. *Hart v. National Mortgage & Land Co.* (1987) 189 Cal.App.3d 1420, 1426 [235 Cal.Rptr. 68].) *Mogilefsky* explains: "California case law recognizes two theories upon which sexual harassment may be alleged. The first is quid pro quo harassment, where a term of employment is conditioned upon submission to unwelcome sexual advances. The second is hostile work environment, where the harassment is sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment. [Citation.] [¶] . . . [¶] A cause of action for quid pro quo harassment involves the behavior most commonly regarded as sexual harassment, including, e.g., sexual propositions . . . . [¶] By contrast, a cause of action for sexual harassment on a hostile environment theory need not allege any sexual advances whatsoever. [Citation.] A cause of action on this theory is stated where it is alleged that an employer created a hostile environment for an employee because of that employee's sex." (*Mogilefsky, supra*, 20 Cal.App.4th at pp. 1414–1415.)

■ Singleton's action is predicated on the second of the two theories. In the terms of the *Mogilefsky* decision, Singleton contends that the harassment was "sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment." "Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances. [Citation.] The plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and that she was actually offended. [Citation.] [¶] The factors that can be considered in evaluating the totality of the circumstances are: (1) the nature of the unwelcome sexual acts or works (generally, physical touching is more offensive than unwelcome verbal abuse); (2) the frequency of the offensive encounters; (3) the total number of days over which all of the offensive conduct occurs; and (4) the context in which the sexually harassing conduct occurred." (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 609–610 [262 Cal.Rptr. 842], fn. omitted.)

Under these tests and standards, whether: (1) Singleton was sexually harassed and (2) his supervisors knew or should have known of the harassment and failed to take immediate and appropriate action, depends on the resolution of multiple questions of fact. Put another way, Singleton has shown

that there are facts to support his claim that he was sexually harassed, that he reported the harassment to his supervisors, and that no action was taken to correct and eliminate the harassment.

"The facts alleged in the affidavits of the party against whom the motion is made must be accepted as true . . . ." (*Blaustein v. Burton* (1970) 9 Cal.App.3d 161, 175–176 [88 Cal.Rptr. 319].) This is a rule of long standing (*Eagle Oil & Ref. Co. v. Prentice* (1942) 19 Cal.2d 553, 556 [122 P.2d 264]) that has received steady support through the years. (E.g., *Leggett v. Di Giorgio Corp.* (1969) 276 Cal.App.2d 306, 311 [80 Cal.Rptr. 697]; *Chilson v. P. G. Industries* (1959) 174 Cal.App.2d 613, 615 [344 P.2d 868]; *Gardner v. Shreve* (1949) 89 Cal.App.2d 804, 808 [202 P.2d 322].) It follows that the trial court was not free to disregard Singleton's testimony, or to select only those parts of his testimony that supported the trial court's ruling.

As far as Ross's conduct was concerned, Singleton testified that Ross made comments about "[m]e performing oral sex on my supervisor, his screwing me in the behind out in the silo, me performing oral sex on himself, just one thing after another" and that these comments were made continuously, every night. Thus, contrary to the trial court's findings, Ross's comments were not limited to the altercation on September 20, 2002, which was free of sexual comments and innuendos, nor is it correct, as the trial court found, that Singleton did not go into "any specifics as far as what was actually said."

The trial court also erred in disregarding the bulk of Singleton's testimony about Umi's comments. Singleton testified that Umi told him that "he would hold my hair and screw from behind. He would hold my hair and f— me in the a—." "I'll [Umi] take you out to the silo, too, and you can perform oral sex on me." In addition, Umi "also made statements that I was having oral sex on my supervisor in the mornings out by the silo. That's why I was still employed by USG." These comments were also made every night.

Singleton testified that he told USG supervisors Thyfaut, Mafia, Uiato and Evans about Ross's and Umi's comments. In fact, Singleton testified that he complained to Mafia and Uiato *every night* about Ross's and Umi's comments.

Given this testimony, the trial court erred in seizing on *one statement* by Singleton to Mafia and/or Uiato that Umi was "sex playing" Singleton.[4] More importantly, it was error to disregard Singleton's testimony describing Umi's sexually explicit and offensive comments.

---

[4] Singleton testified that in his *first* complaint, made either to Mafia or Uiato, he asked his supervisor to "ask Lawrence [Umi] to stop sex playing me." We disagree with the trial court that, given the circumstances of this case, Singleton was obliged to define what he meant by "sex playing."

The trial court also erred in dismissing use of the nickname "Sing-a-ling" as inconsequential. Singleton testified that the meaning of this nickname was that he was being called a homosexual. This fits with the point of the other comments made by Ross and Umi. And Singleton was not alone in interpreting this nickname to be a sexual characterization of him. USG employee Horton also thought that the nickname was sexual in nature.

Finally, according to Singleton, Thyfaut's, Mafia's, Uiato's and Evans's responses to these complaints were effectively to ignore the complaints. Indeed, the response Singleton ascribed to Mafia and Uiato[5] was less than heartening. Thus, instead of taking "immediate and appropriate corrective action," as Government Code section 12940, subdivision (j)(1) requires, USG supervisory personnel did nothing but advise Singleton to "keep working."

Whether Singleton is to be believed about Ross's and Umi's comments and the lack of any action by USG supervisors is, of course, not the issue when it comes to the motion for summary judgment.

Given that, for the purposes of the motion for summary judgment, Singleton's testimony must be accepted as true, the question is whether Ross's and Umi's comments created a hostile work environment because of sex. "A cause of action on this theory [hostile environment] is stated where it is alleged that an employer created a hostile environment for an employee *because of that employee's sex*." (*Mogilefsky, supra*, 20 Cal.App.4th at p. 1415, italics added.)

The recent decision of the California Supreme Court in *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264 [42 Cal.Rptr.3d 2, 132 P.3d 211] (*Lyle*) speaks directly to the question whether Ross's and Umi's comments created a hostile work environment because of sex.

In *Lyle,* the plaintiff was a female comedy writers' assistant who worked on the television show *Friends.* "The show [*Friends*] revolved around a group of young, sexually active adults, featured adult-oriented sexual humor, and typically relied on sexual and anatomical language, innuendo, wordplay, and physical gestures to convey its humor. Before plaintiff was hired, she had been forewarned that the show dealt with sexual matters and that, as an assistant to the comedy writers, she would be listening to their sexual jokes and discussions about sex and transcribing the jokes and dialogue most likely to be used for scripts. After four months of employment, plaintiff was fired because of problems with her typing and transcription. She then filed this action against three of the male comedy writers and others, asserting among

---

[5] "Just tell him 'f— you' and keep on working, John."

other things that the writers' use of sexually coarse and vulgar language and conduct, including the recounting of their own sexual experiences, constituted harassment based on sex within the meaning of the Fair Employment and Housing Act (the FEHA) (Gov. Code, § 12900 et seq. . . .)." (*Lyle, supra*, 38 Cal.4th at pp. 271–272.)

The Supreme Court granted review in *Lyle* to consider the question whether "the use of sexually coarse and vulgar language in the workplace . . . constitute[s] harassment based on sex within the meaning of the FEHA."[6] (*Lyle, supra*, 38 Cal.4th at p. 272.) After setting forth the applicable guidelines that we consider below, the court concluded that, under the facts of *Lyle*, the question was to be answered in the negative.

■ In setting forth the guidelines governing sexual harassment in the workplace, the court in *Lyle* noted that "[l]ike the FEHA, title VII of the federal Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e et seq.) prohibits sexual harassment, making it an unlawful employment practice for an employer, among other things, 'to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]' " (*Lyle, supra*, 38 Cal.4th at p. 278.) The court went on to hold: "Under Title VII, a hostile work environment sexual harassment claim requires a plaintiff employee to show she was subjected to sexual advances, conduct, or comments that were (1) unwelcome [citation]; (2) because of sex (*Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 80–81 [140 L.Ed.2d 201, 118 S.Ct. 998] (*Oncale*)); and (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment [citations]. In addition, she must establish the offending conduct was imputable to her employer. [Citation.] California courts have adopted the same standard for hostile work environment sexual harassment claims under the FEHA. (See, e.g., *Fisher v. San Pedro Peninsula Hospital*[, *supra*,] 214 Cal.App.3d [at p.] 608 (*Fisher*).)" (*Lyle, supra*, 38 Cal.4th at p. 279.)

In the case at bar, Singleton presented more than adequate evidence that showed that Ross's and Umi's comments were unwelcome. Thus, the first element set forth in *Lyle* is met.[7] The same is true of the third element; Singleton testified that work became a "living hell" and that his performance

[6] The other question considered was whether the imposition of liability under the FEHA for sexual harassment based on such speech infringes the defendants' rights of free speech under the First Amendment to the federal Constitution or the state Constitution.

[7] There is some question whether the tripartite test set forth in *Lyle* is actually the same as that applicable to FEHA cases under California law, notably as found in *Fisher, supra*, 214 Cal.App.3d at pp. 609–610. (See text, *ante*, p. 1557.) The California Supreme Court has held that the standards on this issue are the same under Title VII and FEHA. We are, of course, bound by this. Moreover, any textual differences between the test as set forth in *Fisher* and

suffered. In fact, the trial court found that the conduct of other employees, which could only be Ross and Umi, was hostile and abusive, that Singleton was taunted, and that his work was disrupted and sabotaged. This is sufficient evidence to satisfy the third element set forth in *Lyle*, i.e., the conduct complained of was sufficiently severe or pervasive to alter Singleton's conditions of employment and created an abusive work environment.

The question is whether the harassment was "because of sex."

The *Lyle* court addressed the meaning of "because of sex" in terms of Title VII as well as FEHA, concluding that on this question the standards are the same: "In *Oncale, supra,* 523 U.S. 75, the United States Supreme Court explained that 'Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at *"discriminat[ion]* . . . because of . . . sex."* ' (*Oncale, supra,* 523 U.S. at p. 80.) Consequently, the high court stated, 'workplace harassment, even harassment between men and women, is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations.' (*Ibid.*) Rather, ' "[t]he critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." ' (*Ibid.*, quoting *Harris[v. Forklift Systems, Inc.* (1993)] 510 U.S. [17] [126 L.Ed.2d 295, 114 S.Ct. 367] (conc. opn. of Ginsburg, J.).) This means a plaintiff in a sexual harassment suit must show 'the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted *"discrimina[tion]* . . . because of . . . sex."* ' (*Oncale, supra,* 523 U.S. at p. 81.) [¶] For FEHA claims, the discrimination requirement has been phrased similarly: 'To plead a cause of action for [hostile work environment] sexual harassment, it is "only necessary to show that gender is a substantial factor in the discrimination, and that if the plaintiff 'had been a man she would not have been treated in the same manner.' " [Citation.]' (*Accardi v. Superior Court* (1993) 17 Cal.App.4th 341, 348 [21 Cal.Rptr.2d 292] . . . ; [citation].) Accordingly, it is the disparate treatment of an employee on the basis of sex—not the mere discussion of sex or use of vulgar language—that is the essence of a sexual harassment claim." (*Lyle, supra,* 38 Cal.4th at pp. 279–280.)

That there is evidence in this case that Singleton was "disparately" treated because of his sex is best expressed by Singleton himself. Referring to Ross's

*Lyle* are in any event of no moment in this case. Aspects of the *Fisher* test not expressly covered by the *Lyle* test (e.g., frequency and duration of offensive conduct) are amply satisfied in the case at bar. The focus in the case at bar is on the question whether the harassment took place "because of sex." The *Lyle* test articulates this more clearly than the test set forth in *Fisher.*

statements, Singleton testified in his deposition: "He would say things that I would say would challenge me as a man." The comments made by Ross and Umi would "challenge" any heterosexual male "as a man." This is not to express preference for one sexual orientation over another. It is to state that Singleton recognized, as would any reasonable heterosexual male, that Ross and Umi targeted Singleton's heterosexual identity, and attacked it by and through their comments.

Given that Ross and Umi were attacking Singleton's sexual identity, it stands to reason there is no evidence that Ross and Umi treated women the way they treated Singleton. Whatever Ross's and Umi's attitudes were toward women, those attitudes were irrelevant to their treatment of Singleton. Putting this point another way, given that Ross and Umi had targeted Singleton's identity as a heterosexual male, it is axiomatic that they would treat women "differently," i.e., not attack them for the same reason. It follows that the harassment was "because of sex," i.e., it employed attacks on Singleton's identity as a heterosexual male as a tool of harassment.

■ USG contends that under *Oncale, supra,* 523 U.S. 75, which is also a "same-gender" sexual harassment case, Singleton must prove "one of three propositions" in order to recover. *According to USG,* these "propositions" are: "(1) that the harasser's conduct constituted an earnest sexual solicitation; (2) that the alleged harasser displayed a general hostility to males in the workplace; or (3) the alleged harasser treated men and women differently." However, there is nothing in *Oncale* that supports any one of these three "propositions." In fact, as we show below, a fair reading of *Oncale* leads one to conclude that the court rejected narrowly defined categories of same-gender sexual harassment, such as USG's three "propositions."

In *Oncale,* the plaintiff, a member of an eight-man oil rig crew, had been "forcibly subjected to sex-related, humiliating actions" by members of the crew. The district court dismissed his action for sexual harassment on the ground that, as a male, the plaintiff had no claim for sexual harassment against other males. (*Oncale, supra,* 523 U.S. at p. 77.) The Supreme Court first held that same-gender harassment claim was included in the coverage of Title VII, contrary to some decisions of the federal circuit courts of appeals. (*Oncale, supra,* at pp. 79–80.) The next stop on the court's agenda was to hold that the plaintiff in a same-gender case, as in any sexual harassment case, must prove that the conduct at issue was not "merely tinged with offensive sexual connotations," but actually constituted discrimination *because of sex.* (*Id.* at p. 81.) ■ In the final section of its (short) opinion, the *Oncale* court described the factual and social context in which same-gender

sexual harassment cases must be decided: "The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment. 'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.' [Citation.] We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory 'conditions of employment.' [¶] We have emphasized, moreover, that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' [Citation.] In same-sex (as in all) harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." (*Id.* at pp. 81–82.)

Accepting, as one must for the purpose of the motion for summary judgment, Singleton's testimony as true, it is apparent that, in terms of the factual and social context, as those concepts are defined in *Oncale*, there is sufficient evidence of actionable sexual harassment.

In the factual context, the "conditions of employment" were clearly affected by Ross's and Umi's misconduct. Singleton testified that work became a "living hell" for him, which, if he is to be believed about Ross's and Umi's misconduct, is understandable. Indeed, the trial court recognized that Ross and Umi created difficult, if not intolerable, working conditions for Singleton.[8]

---

[8] The trial court found: "Plaintiff has presented substantial evidence that graveyard shift production workers insulted him, spoke rudely to him, interfered with his maintenance work, deliberately sabotaged machine operations and taunted him while he tried fruitlessly to

■ The social context within which Ross and Umi acted also makes clear that what these two men intended to do was to harass Singleton. Ross's motive was that he was angry with Singleton for having reported him, and for having spoken disparagingly of Ross's skills. Umi appears to have been Ross's camp follower. What took place between Ross, Umi and Singleton was not "male-on-male horseplay" (*Oncale, supra*, 523 U.S. at p. 81) but the acting out, on the part of Ross and Umi, of their anger and rage at Singleton. In this connection, we note that there is no requirement that the *motive* behind the sexual harassment must be sexual in nature. "[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." (*Id.* at p. 80; accord, *Mogilefsky, supra*, 20 Cal.App.4th 1409, 1418.) Sexual harassment occurs when, as is alleged in this case, sex is used as a weapon to create a hostile work environment.

We have already noted that there is no support in *Oncale* for the three "propositions" that USG professes to have distilled from *Oncale*. Indeed, USG's "propositions" cannot be reconciled with either the letter or the spirit of this decision. Not only is there not a single reference in *Oncale* to any of these three "propositions," the urbane approach taken by the court in *Oncale* rests on a recognition that the settings in which sexual harassment occurs are varied and defy classification. Thus, same-gender sexual harassment cannot be boiled down to oversimplified propositions such as "general hostility to males in the workplace" or "the alleged harasser treated men and women differently."

Finally, we reject USG's implausible contention that "the statements cannot be considered offensive by Singleton" because Singleton himself used some vulgar expressions. (Boldface omitted.) As *Oncale* teaches, one must consider the social setting in which the comments or conduct takes place. What is, in one setting, a simple vulgarity, is, in another setting, an act of harassment.

Since we find that there are triable issues of material fact whether Singleton was subjected to sexual harassment in violation of FEHA, the trial court's rulings on all four causes of action must be set aside.

---

troubleshoot problems and get the machinery operating again. Such behavior by the nonsupervisory employees was hostile and abusive, but there is no triable issue of fact that the hostility or abuse was related to plaintiff's gender or sexual orientation. It is therefore not protected by FEHA."

## DISPOSITION

The judgment is reversed. Appellant is to recover his costs on appeal.

Cooper, P. J., and Boland, J., concurred.

A petition for a rehearing was denied July 24, 2006, and respondent's petition for review by the Supreme Court was denied September 13, 2006, S145596.