Filed 3/27/14  Terry v. D3 Technologies CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| BRIAN TERRY,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>D3 TECHNOLOGIES, INC. et al.,<br><br>    Defendants and Respondents. | D063395<br><br><br>(Super. Ct. No. 37-2011-00092814-<br> CU-WT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Richard E. L. Strauss, Judge.  Affirmed.

Mitchell & Gilleon and James C. Mitchell for Plaintiff and Appellant.

Rukin Hyland Doria and Tindall and John Francis Hyland for Defendants and Respondents.

Brian Terry sued his former employer (D3 Technologies, Inc.) and its parent corporation (collectively, D3) for wrongful termination in violation of public policy and

preemptive retaliatory termination (Lab. Code, § 1102.5[1]).  The court granted D3's summary judgment motion and entered judgment in D3's favor.  Terry appeals.  We affirm.

FACTUAL AND PROCEDURAL SUMMARY

*Factual Summary*

In summarizing the relevant facts, we assume the truth of the evidence submitted by Terry and disregard conflicting evidence presented by D3.  (See *Singleton v. United States Gypsum Co.* (2006) 140 Cal.App.4th 1547, 1558.)  Because we do not reach the causation issue, we omit a detailed description of the facts related solely to this issue.

D3 provides engineering and design services to the aerospace industry.  In 2005, D3 hired Terry, an aerospace engineer who had substantial experience as a structural analysis engineer and stress analyst of aircraft component parts.  During the next four years, Terry received raises and positive performance reviews.

In September 2009, D3 entered into a contract with Mitsubishi Aircraft Corporation (Mitsubishi) to design the tailcone of a commercial passenger jet (the MJET project).  D3 was responsible for designing the tailcone and the systems to be installed within the tailcone, including struts and mounts for the auxiliary power unit (APU).  The APU is used to restart the aircraft's engines if the main engines shut down, and is essential to the safe operation of the aircraft.

---

[1]     Labor Code section 1102.5 (§ 1102.5) was amended in 2013, and the amendments became effective on January 1, 2014.  (Stats. 2013, ch. 781, § 4.1.)  All further references to section 1102.5 are to the former version of the statute.

2

Terry was assigned to work on the MJET project as technical coordinator for the stress or vibration levels. One of Terry's main duties was to prepare, deliver, and "sign off on" a vibration report that outlines the possible stress or vibration levels on the parts and components of the tailcone assembly, including the APU mounting system. In this report Terry was required to certify that the stress or vibration levels within the tailcone assembly and its components were insignificant and/or covered by the specification levels for the tailcone assembly and aircraft. In other words, Terry was required to state and substantiate that the tailcone system is safe for the vibration and stress environment to which it will be exposed.

The Mitsubishi contract provided for two stages of design review: (1) a "Preliminary Design Review" (PDR); and (2) a "Critical Design Review" (CDR). As is typical in the industry, the contract incorporated an iterative process during which the entities work together to obtain a final design, and specified a multi-step review process requiring that D3 submit updated progress reports, including development, refinement and revision of the component designs. The contract provided deadlines for report submissions, and tied progress payments to timely completion of reports. The parties expected that throughout the design process there would be many changes to the reports, which contain express disclaimers that the information was preliminary and subject to modification.

During the PDR and CDR stages, if D3 could not include necessary data in a particular report, it could, as an alternative, submit a "Closure Plan" to note the missing

3

or incomplete data, outline the plan for obtaining that data, and state the expected date for doing so. The Closure Plan serves as a placeholder for missing or incomplete data.

After the PDR and CDR stages, the process moves into the production stage, during which the designs continue to evolve as blueprints are created and manufacturing commences. The manufacturer (or subcontractor) then conducts extensive testing of the entire aircraft to ensure the safety and integrity of the final aircraft design. The last stage is the "Certification Phase" during which the regulatory authorities approve the final aircraft design. This approval involves Federal Aviation Administration (FAA) review of all final engineering drawings, reports and data, and observations of all required testing. Upon successful completion of this rigorous review, the regulatory authorities issue a " 'Type Certification' " certifying that the aircraft meets the airworthiness requirements.

In February 2010, D3 submitted a vibration report, prepared by Terry, as part of its PDR submission to Mitsubishi. Shortly after, Mitsubishi rejected the report, concluding the report lacked necessary data regarding the stress and vibration levels for the tailcone assembly and its components within the actual " 'vibration environment' " (the environment to which the parts would be exposed during the aircraft's use). Under its contractual obligations, D3 was required to revise and resubmit all of the rejected reports by March 31, 2010.

D3 immediately directed Terry to prepare a revised vibration report substantiating that the tailcone assembly and its components are safe for the environment to which they would be exposed, i.e., the system components of the tailcone assembly were properly designed for the particular vibration environment. Based on his expertise, Terry

4

concluded that this certification required data regarding the particular vibration environment to which the tailcone would be exposed. Without the underlying data, Terry believed he "would be falsely stating" that this portion of the aircraft "met safety requirements."

During the next several weeks, Terry sought to obtain the necessary data from Mitsubishi and from a subcontractor, both of which had access to this information. However, neither the subcontractor nor Mitsubishi responded with the necessary information. In response, Terry repeatedly informed his supervisors that he could not prepare the requested report without the underlying data because of safety concerns. Terry made it "very clear to management in all levels of supervision" that he would not sign the report "without the vibration environment being defined to me."

After Terry made additional unsuccessful efforts to obtain the vibration environment data, D3 began to pressure him to prepare and sign a report certifying that "the system components had been properly assessed against the environment to which they would be exposed." Terry resisted, believing such statement would be false. Terry said: "Pressure was put on me to ignore aspects of the technical assessment, specifically, the need to compare the specification levels of equipment to the environment and conclude that they were safe for flight."

Terry's supervisors said the vibration environment data was not a necessary prerequisite and that Terry could provide the required substantiation by using "the overall generic vibration levels that all flight hardware has to meet." Terry responded that he would not do this because Mitsubishi "required [the specific vibration data analysis] and

it was an aircraft safety issue, and . . . I would not sign anything that might lead to a safety concern." According to Terry, "[Mitsubishi was] asking for a complete report which certifies, states and substantiates that the system[ ] is safe for the environment to which it was exposed," and he could not affirmatively state that the system is safe without the underlying data for the particular vibration environment.

On March 17, 2010, Terry wrote an email to D3's chief executive officer, expressing concern about a communication "breakdown" between D3 and Mitsubishi and between D3 and the subcontractor regarding the missing technical vibration data information. He said he was "being pressured by D3 management to revise [the vibration report] without the required customer supplied information and submit poor quality and technically deficient content."

By the March 31 deadline, Terry had not received the vibration environment data and thus did not prepare or deliver the requested vibration report. He instead submitted a revised Closure Plan, stating that the vibration report revision would not be submitted until May 1, 2010.

Mitsubishi did not pay the $5 million milestone payment based solely on the fact that D3 did not provide the requested revised vibration report by March 31. Shortly after, D3 terminated Terry. D3 said it terminated Terry for his "poor performance [on the MJET project], his failure to meet a critical delivery deadline, and his ongoing interpersonal problems and the resulting conflicts with his colleagues."

In early May 2010, D3 completed the revised vibration report and submitted it to Mitsubishi. The revised vibration report included the additional vibration environment

6

data that had been missing in the earlier report.  After submitting the report, D3 continued developing and revising its designs.   It revised and resubmitted the vibration report more than eight times after the May 2010 submission, including to respond to a complete revision of the APU mount system design.

In April 2011, D3 submitted the final CDR vibration report, and in June 2011, D3 completed the CDR phase.  The MJET project was thereafter subject to the remaining review stages, including the production, testing, and certification phases.

*Complaint and Summary Judgment Motion*

About one year after he was terminated, Terry filed a complaint against D3 alleging two causes of action:  (1) wrongful discharge in violation of public policy; and (2) preemptive retaliatory termination (§ 1102.5).  Terry alleged he was terminated in retaliation for his "complaints, protests, questioning and whistleblowing about what he believed was a deficient 'vibration report' for the tailcone assembly and components for a commercial passenger aircraft that were essential to the safe operation of that aircraft." He also alleged D3 "terminated his employment because they suspected and feared that [he] intended to report them to governmental agencies, including but not limited to the Federal Aviation Administration or related agencies administering air travel within the United States, for violations of the law."

D3 moved for summary judgment and/or for summary adjudication.  With respect to the public policy wrongful termination claim, D3 argued the undisputed evidence established D3's alleged wrongful conduct did not constitute protected activity or implicate a "fundamental public policy."  In support, D3 argued and submitted evidence

7

that Terry's claim was based on his allegation that he was terminated for refusing to submit an "*incomplete* report," and asserted that Terry did not identify any "statute, constitutional provision, or administrative regulation" making it unlawful to "submit an *incomplete* report at the preliminary design phase." (Italics added.) D3 also emphasized the evidence showing the revised vibration report was to be submitted at a very preliminary phase of the design process (the PDR stage), and was subject to substantial change and numerous modifications before it reached the production and testing phase. Based on this evidence, D3 argued the content of the vibration report was unrelated to safety issues and was not governed by any federal statute or regulation, and thus did not involve a fundamental public policy.[2]

In opposing the summary judgment motion, Terry acknowledged that reports submitted at the PDR phase are subject to substantial update and modification, but argued his claim was based on a violation of a fundamental public policy because: (1) he was terminated for refusing to *approve* the design of the tailcone for vibration environment purposes (not merely to submit an incomplete report); (2) there was not enough underlying data for him to reach a conclusion as to whether the design should be approved with respect to the vibration issues; and (3) if the revised vibration report was unmodified during the later design and production stages, it could lead to substantial safety problems because the conclusion in the report was based on unsubstantiated

---

[2] D3 also argued that Terry was terminated for unrelated performance reasons. Because we do not reach the issue, we omit a discussion of this argument and the underlying facts.

8

information.  Relying on *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66 (*Green*), Terry argued D3's insistence that he prepare a vibration report with unsubstantiated information, and then firing him for refusing to do so violated public policy because the preparation of a false report on an aircraft component design is inconsistent with applicable federal statutes and regulations, and can lead to substantial public safety issues.  In support, Terry cited to various federal statutes and regulations pertaining to aircraft safety.  (See, e.g., 49 U.S.C. §§ 44701(a)(1), 44704(a)(b)(d); 14 C.F.R. §§ 21.21, 21.183, 21.137, 23.613(b)(c)(d).)

With respect to the second cause of action (statutory retaliation claim), D3 asserted several arguments, including that the statute is inapplicable because Terry never made a complaint to a governmental or law enforcement agency.  Terry acknowledged he had never reported any unlawful conduct to a government agency, and did not specifically address this cause of action in his opposition papers.

After considering the parties' submissions and conducting a hearing, the court granted D3's summary judgment motion.  On the wrongful termination in violation of public policy claim, the court found that even assuming the truth of Terry's evidence, Terry could not recover on the claim because there was no showing D3 violated a fundamental public policy.  The court reasoned that the undisputed facts established the revised vibration report was a preliminary report that had no reasonable relationship to the manufacturing of the aircraft and Terry failed to identify "any specific statute or regulation which might have been violated" regarding this preliminary report.  On the statutory retaliation cause of action, the court similarly found Terry could not recover

9

because he failed to establish that "approval of the Vibration Report would have been a violation of a state or federal statute." The court additionally found the claim was unsupported because "it is undisputed Terry never made a report to a government agency regarding the purported violation."

Terry appeals.

## DISCUSSION

### I. *Governing Summary Judgment Standards*

A summary judgment motion "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A triable issue of material fact exists only if "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850 (*Aguilar*).)

We review a summary judgment de novo. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 60.) We assume the role of the trial court and redetermine the merits of the motion. In doing so, we strictly scrutinize the moving party's papers and resolve all doubts in favor of the opposing party. (*Barber v. Marina Sailing, Inc*. (1995) 36 Cal.App.4th 558, 562.) We consider all of the evidence and inferences reasonably drawn from the evidence, and view the evidence in the light most favorable to the opposing party. (*Aguilar, supra*, 25 Cal.4th at p. 843.)

10

## II. *Wrongful Termination in Violation of Public Policy*

### A. *Applicable Law*

Generally, an at-will employee may be terminated for any reason. One exception to this rule is that an employer has no right to terminate an employee for a purpose that violates fundamental public policy. (*Silo v. CHW Medical Found.* (2002) 27 Cal.4th 1097, 1104 (*Silo*).) This exception is narrowly construed and "must be based on policies carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions" (*ibid.*), or in regulations implementing particular statutory schemes. (*Green, supra*, 19 Cal.4th at p. 71 [regulations implementing the Federal Aviation Act reflect a fundamental public policy pertaining to aircraft safety].)

In making clear that the public policy must be tethered to a *specific* statutory, constitutional, or regulatory basis, the California Supreme Court explained that " ' " 'public policy' as a concept is notoriously resistant to precise definition, and [thus] courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch" in order to avoid judicial policymaking.' [Citation.] [The requirement] also serves . . . [to] ensur[e] that employers are on notice concerning the public policies they are charged with violating. 'The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes. . . .' [Citations.] The public policy that is the basis of this exception must furthermore be ' "public" in that it "affects society at large" rather than the individual, must have been articulated at the time of discharge, and must be " 'fundamental' " and " 'substantial.' " ' [Citation.]" (*Silo, supra*, 27 Cal.4th at p. 1104.)

11

B. *Analysis*

Terry based his public policy wrongful termination claim on federal statutes and regulations that establish specific standards to ensure the safe "design, material, construction, quality of work, and performance of aircraft." (49 U.S.C. § 44701(a)(1); see *United States v. Varig Airlines* (1984) 467 U.S. 797, 816-817.) Terry argues he was wrongfully terminated because he refused to prepare a vibration report that was inaccurate, not merely incomplete, and that such a report would have been unlawful under these statutes and regulations. Specifically, he cites current regulations requiring that manufacturers: (1) have "quality system[s]" that conform to approved design of aircraft and aircraft parts (see 14 C.F.R. § 21.137); (2) ensure that design values for aircraft parts minimize the probability of structural failure caused by material variability (14 C.F.R. § 23.613(b)); (3) consider the effects of temperature on allowable stresses used for design of aircraft parts (14 C.F.R. § 23.613(c)); (4) design structures to "minimize the probability of catastrophic fatigue failure, particularly at points of stress concentration" (14 C.F.R. § 23.613(d)); and (5) ensure component parts are "of a kind and design appropriate to its intended function" and function "properly when installed" (14 C.F.R. § 25.1301(a)(1)(4)). He also cites various regulations governing FAA certification procedures. (See, e.g., 14 C.F.R. §§ 21.21, 21.173.)

As the California Supreme Court has recognized, these statutes and regulations embody a fundamental public policy promoting aircraft safety, and can be the source for a wrongful termination in violation of public policy claim. (*Green, supra*, 19 Cal.4th at pp. 80-83.) However, in this case, Terry did not present evidence showing D3 violated

12

any of the cited statutes or regulations. Terry claims he was fired because he refused to include inaccurate information in a report prepared at the PDR stage. It is undisputed that the FAA does not regulate, and has no involvement in, reports prepared at this design stage. As conceded by Terry, a PDR is a "snapshot" of information gathered at the initial stage of the design process, and PDR documents are not submitted to, or approved by, any government agency. The cited regulations pertain to later stages of design and production (particularly the certification stage) that seek to ensure aircraft component parts are in a condition for safe operation. There is no showing the regulations apply to the process by which those involved in the design of an aircraft collaborate and share information or otherwise arrive at the final design submitted for FAA approval. (See, e.g., *Martin ex rel. Heckman v. Midwest Express Holdings* (9th Cir. 2009) 555 F.3d 806, 814 ["In the field of aircraft design regulations, the FAA directs only the conditions under which the government may grant an aircraft design a 'certificate' that permits production; the FAA does not prescribe general standards the manufacturer must follow to exercise reasonable care in designing a safe aircraft."], italics omitted.)

Terry contends that although the federal statutes and regulations may not specifically apply at the PDR stage, he maintains they should apply because an inaccurate PDR report could set a "path" for an improper design at the certification stage, creating public safety issues if the information remains in the final reports. In support, he relies on his own deposition testimony in which he opined that it is "extremely risky" to include inaccurate information in a preliminary report because "[o]nce a document has been . . . submitted [at the PDR stage], then there is every chance that that document will end up

13

being part of the certification package." Terry argues this testimony, "[i]f credited by a jury, allowed the conclusion that a complete and correct vibration report at every stage of the design and manufacturing process was subject to FAA regulations because incorrect or incomplete information and data concerning the design of the tailcone assembly, even at the preliminary design stage, could end up being part of the final certification process."

Terry's deposition testimony is insufficient to raise a triable issue of fact regarding whether D3 violated a fundamental public policy. First, the California Supreme Court has made clear that the wrongful termination tort can be established if, and only if, it is based on an alleged violation of a specific statute, constitutional provision, or public safety regulation. (*Green, supra*, 19 Cal.4th at pp. 79-80.) Here, it is undisputed D3's alleged insistence that Terry include inaccurate information in a report during the PDR stage did not violate a statute, constitutional provision, or public safety regulation. There are various conceivable reasons that the FAA does not regulate the preliminary design process, including to allow for collaboration and the exchange of ideas that may enhance and support the creation of a better and safer product. For this court to decide there is a public policy that preliminary reports should be scrutinized at the same level as are final certification reports would be the sort of judicial policymaking from which the California Supreme Court has repeatedly admonished courts to refrain.

Moreover, even assuming a public policy claim could be established by a close nexus between the defendant's challenged conduct and a statute or regulation, Terry's deposition testimony is insufficient to show this connection. Despite Terry's assertions that it is "risky" to include inaccurate information in a preliminary report because this

14

information may remain in a final report, Terry did not dispute D3's evidence that a component-part design is subject to numerous changes before it reaches the certification stage, including throughout the PDR and CDR stages and during the blueprint and production phases. After these stages, the aircraft and its component parts undergo rigorous testing and a complete certification process monitored by regulatory agencies. Consistent with this design development process, D3's vibration report included an express disclaimer regarding its preliminary nature and was changed at least eight times after March 31, 2010, including after the fundamental design of the APU mounting system was changed. In light of the evolving nature of the design process, Terry's deposition testimony was insufficient to show a triable issue of fact regarding a meaningful nexus between the contents of the PDR vibration report and FAA public safety regulations.

In urging us to recognize a fundamental public policy in this case, Terry relies on *Green, supra*, 19 Cal.4th 66. Although there are superficial similarities between this case and *Green*, the material facts are very different. In *Green*, the plaintiff was a quality control inspector who worked for a subcontractor that manufactured aircraft fuselage and wing components. (*Id.* at p. 72.) The employer terminated the plaintiff after he complained that the employer was *shipping* aircraft parts that had not passed inspection to airline and military assembly companies. (*Id.* at p. 73.) The plaintiff sued claiming he had been wrongfully terminated in violation of public policy. (*Ibid.*) The trial court granted the employer's summary judgment motion, accepting the employer's argument that the public policy cause of action was unsupported because the employer's conduct

did not violate a specific statutory or constitutional provision, and a federal regulation could not serve as the public policy source for a wrongful termination claim. (*Id.* at pp. 73-74.)

The California Supreme Court disagreed, concluding that public safety regulations promulgated under specific legislative authority may establish a fundamental public policy for purposes of the wrongful termination tort. (*Green, supra*, 19 Cal.4th at pp. 71-72, 74.) The high court detailed the federal regulatory scheme governing aircraft quality control inspection systems, including that each prime manufacturer must submit to the FAA " 'data describing the inspection and test procedures necessary to ensure that each article produced conforms to the type design and is in a condition for safe operation' " and a " 'description of inspection procedures for . . . parts and assemblies produced by manufacturers' suppliers [such as defendant] including methods used to ensure acceptable quality of parts and assemblies that cannot be completely inspected for conformity and quality when delivered to the prime manufacturer's plant. . . .' " (*Id.* at p. 81.)

Relying on these FAA quality-control regulations, the *Green* court held the plaintiff's claim that he was terminated for complaining that the employer was violating inspection rules and shipping defective component parts for installation on an aircraft was founded on a public policy specifically "tethered" to the federal regulations. (*Green, supra*, 19 Cal.4th at p. 74.) The court reasoned that the plaintiff presented evidence that he was terminated for complaining that his employer was unlawfully manipulating or undermining "*FAA-required inspections*" and these mandatory inspections were intended

16

to further a fundamental public policy:  " 'to ensure that each article produced conforms to the type design and is in a condition for safe operation.' "  (*Id.* at p. 82, italics added.)

The circumstances here are materially different.  In *Green*, the cited federal regulations specifically imposed standards for the component-part inspection process, and the evidence showed the defendant violated these rules and then terminated an employee for complaining about this violation.  (*Green, supra*, 19 Cal.4th at pp. 80-83, 85-87.)  In this case, Terry does not identify any regulations imposing standards for information included in preliminary design reports.

Terry argues that the defendant/employer in *Green*, similar to D3, was a subcontractor and thus not directly subject to the FAA inspection regulations.  However, the California Supreme Court explained that the federal regulatory scheme specifically envisions that manufacturers rely on *subcontractor inspections of manufactured component parts* in representing the safety and soundness of the airplane parts to the FAA during the certification process.  (*Green, supra*, 19 Cal.4th at pp. 85-87.)  Thus, the *Green* court found the fundamental public policy requiring proper inspections logically extends to the subcontractor.  (*Ibid.*)  In this case, there is no similar showing that a subcontractor's preliminary design report would have any meaningful relevance during the FAA final review and certification process.

Additionally, the *Green* court emphasized the importance of notice to an employer in determining whether an employee has sufficiently established the existence of a fundamental public policy, and observed that " 'No reasonable component manufacturer could read those [federal] regulations and believe it was free to supply parts which failed

17

inspection or could perform inspections that failed to meet the standards established by "prime manufacturers". . . .' " (*Green, supra*, 19 Cal.4th at p. 87.) This reasoning does not apply to a report prepared at the PDR stage. There are no reasonable grounds to find that D3 would understand that the contents of the PDR vibration report were governed by a federal statute or regulation. In *Green,* public safety was clearly at risk if an aircraft manufacturer incorporates defective parts into the wings and fuselage of an aircraft. There is no principled basis for reaching a similar conclusion regarding information contained in a preliminary report.

To state a termination in violation of public policy claim, the plaintiff must show he or she was discharged in violation of a public policy that is "delineated" in a specific constitutional, statutory, or regulatory provision. "A requirement that a policy be 'delineated' entails more specificity than merely being 'derived from' or 'based' on its source. To 'delineate' means '. . . to describe in detail, esp. with sharpness or vividness' [citation]; '. . . to describe, portray, or set forth with accuracy or in detail' [citation]." (*Sequoia Ins. Co. v. Superior Court* (1993) 13 Cal.App.4th 1472, 1480.) To ensure adequate notice, the provision reflecting the public policy must sufficiently describe the type of conduct that is prohibited. (*Ibid.*, see *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1256, fn. 9.)

Under these principles, Terry must do more than identify a compelling public policy and then show a potential link between the defendant's conduct and the public policy. Terry must show a violation of a fundamental public policy embodied in, or tethered to, a statute or regulation, *and* a clear nexus between the employer's actions and

18

the identified public policy. (See *Turner v. Anheuser-Busch, Inc., supra*, 7 Cal.4th at p. 1258.) Terry failed to meet this burden in this case.

### III. *Statutory Retaliation Cause of Action*

In his second cause of action, Terry asserted a claim for preemptive retaliation in violation of former section 1102.5. Terry alleged defendants terminated him "because they suspected and feared that [he] intended to report them to governmental agencies . . . ."

Former section 1102.5 made it unlawful for an employer to "retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." (§ 1102.5, subd. (b).) "This provision reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation." (*Green, supra*, 19 Cal.4th at p. 77.)

Under the express terms of former section 1102.5, a plaintiff must have a reasonably based suspicion that the employer is engaged in illegal activity *and* must disclose this information "to a government or law enforcement agency." (§ 1102.5; see *Green, supra*, 19 Cal.4th at p. 77.) In this case, the undisputed evidence established Terry never disclosed any information to a governmental or law enforcement agency. Moreover, as discussed above, the record does not support that D3 violated any applicable statute or regulation with respect to D3's requests that Terry prepare and

19

certify the information in the vibration report. Thus, the court properly granted summary judgment on this claim.

Terry argues that a plaintiff states a claim under former section 1102.5 without disclosing information to a governmental or law enforcement agency if he or she is terminated because the employer suspects the employee may make a report. However, there is no evidence in the record showing that Terry was terminated because D3 believed or suspected Terry may make a report. Moreover, Terry's argument is contrary to the plain language of the former statute. Terry cites *Green, supra*, 19 Cal.4th at p. 77 and *Lujan v. Minagar* (2004) 124 Cal.App.4th 1044. These decisions do not support his argument. *Green* confirms that former section 1102.5 protects employees only if they report suspicions to public agencies; and *Lujan* considered only the common law tort and not the statutory whistleblower statute.

In his reply brief, Terry identifies section 1102.5, subdivision (c) as a basis for his statutory claim. Section 1102.5, subdivision (c) provides "An employer . . . shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." Terry forfeited this contention by failing to cite this subdivision in his opposition papers below or in his opening appellate brief. In any event, the record does not support that D3 violated this subdivision because there is no evidence of an underlying statutory or regulatory violation.

DISPOSITION

Judgment affirmed.  Appellant to bear respondents' costs on appeal.


_____
                                                                                              HALLER, J.

WE CONCUR:


_____
                      BENKE, Acting P. J.


_____
                      HUFFMAN, J.

21