Filed 3/2/15  Chavez v. Southern Cal. Edison Co. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| ALEJANDRO MADERA CHAVEZ,<br><br>　　　Plaintiff and Appellant,<br><br>　　v.<br><br>SOUTHERN CALIFORNIA EDISON<br>COMPANY et al.,<br><br>　　　Defendants and Respondents. | B253514<br><br>(Los Angeles County<br>Super. Ct. No. BC484264)<br><br>**ORDER MODIFYING OPINION**<br><br>**[NO CHANGE IN JUDGMENT]** |

THE COURT:[*]

It is ordered that the opinion filed herein on February 3, 2015, be modified as follows:

On page 25, the second full paragraph, second sentence beginning "Indeed, the only" is deleted and the following sentence is inserted in its place:

> Indeed, the only way the jury was not misled was if it ignored the trial court's erroneous instruction.

There is no change in the judgment.

---

[*]　ASHMANN-GERST, Acting P. J., MOSK, J., HOFFSTADT, J.

Filed 2/3/15  Chavez v. Southern Cal. Edison Co. CA2/2 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ALEJANDRO MADERA CHAVEZ, | B253514 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC484264) |
| v. | |
| SOUTHERN CALIFORNIA EDISON COMPANY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Victor E. Chavez, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Law Offices of Louis Benowitz, Louis Benowitz; The Ottinger Firm, Robert W. Ottinger; and Ariel Y. Graff for Plaintiff and Appellant.

John D. Buchanan, Amy Gantvoort; Littler Mendelson, Robert W. Conti and Lauren E. Robinson for Defendant and Respondent Southern California Edison Co.

Andrews ᐧ Lagasse ᐧ Branch & Bell, Jonathan D. Andrews and Erin J. Denatale for Defendants and Respondents Vincente Dominguez and Kelly Gulley.

_____

Pursuant to the Fair Employment and Housing Act (FEHA) Alejandro Madera Chavez (Chavez) sued Vincente Dominguez (Dominguez), Mark Scribner (Scribner) and Kelly Gulley (Gulley) for sex harassment (Gov. Code, § 12940, subd. (j)(1))[1], and Southern California Edison Company (SCE)[2] for failure to take immediate corrective action (§ 12940, subd. (j)(1)) and failure to take reasonable steps to prevent sex harassment (§ 12940, subd. (k)).  In addition, Chavez alleged common law tort claims against Dominguez, Scribner and Gulley for assault, battery, sexual battery and intentional infliction of emotional distress.  The jury found in favor of Chavez on his assault and battery causes of action against Scribner.  In all other respects, the jury found in favor of the SCE Defendants.  Claiming instructional error, Chavez appeals the judgment regarding his FEHA causes of action.

The primary question presented is whether the trial court properly instructed the jury that same gender sex harassment cannot be established under the FEHA unless the harasser was motivated by sexual desire, general hostility toward his own gender in the workplace, or a desire to punish the harassed employee for failing to comport with gender stereotypes.  We find instructional error because same gender sex harassment does not require a specific motivation to be actionable.

The portions of the judgment pertaining to the sex harassment causes of action against Dominguez and Scribner, and the failure to take corrective action cause of action against SCE, are reversed because it is reasonably probable that the jury would have found them liable on those causes of action if it had been properly instructed.  In all other respects, the judgment is affirmed.

---

[1]     All further statutory references are to the Government Code unless otherwise indicated.

[2]     Collectively, SCE, Dominguez, Gulley and Scribner are referred to as the SCE Defendants.

The matter is remanded for a new trial on Chavez's causes of action against Dominguez and Scribner for sex harassment, and his cause of action against SCE for failure to take immediate corrective action.

**FACTS**

**Evidence at Trial**

*Chavez's Testimony*

Chavez is a heterosexual man.

In early 1999, he began working for SCE as a Meter Reader 2. Eventually, he became a groundman based in Dominguez Hills. The primary job of a groundman is to load equipment and make deliveries to crews in the field. He was living in Riverside, and it took him over an hour, and sometimes up to two hours, each way to commute to work.

In February 2011, Chavez requested a transfer to Redlands so he would have a shorter commute. He was assigned to the Redlands night crew. On that crew, Robert Bravo (Bravo) was the foreman, Dominguez and Dan Mariscal (Mariscal) were linemen, and Scribner was the "lead line." The linemen were responsible for the "hot work, meaning anything that required rubber gloves, training, . . . doing switching, being up in the bucket, being on the pole, [and] climbing the pole[.]" Chavez took direction from the foreman and the rest of the crew regarding material, such as where and when Chavez needed to deliver the material, and how it should be prepped. Scribner was the foreman when Bravo was unavailable.

According to Chavez, he liked his new job at first, but that changed soon after an incident in Bravo's office. Bravo told Chavez to get some ground molding. Because he was not sure what molding was, he asked Bravo a question about it. Dominguez looked at Chavez and said, "Man, you don't know shit." From that point on, Dominguez and Scribner would say to Chavez phrases such as, "You don't know shit," "You are an asshole," "Get the fuck over here," and "What the fuck are you doing?" In particular, they would say to Chavez, "You fucking faggot," and that happened "[a]most on a daily basis." Chavez was the only person that the crew members would call a "fucking

3

faggot." In general, profanity and sexual jokes at the work place did not offend Chavez, but he was offended whenever profanity or sexual jokes were directed at him.

In March 2011, the Redlands night crew was in Palm Springs. Chavez was straddling over a manhole and removing it. Dominguez walked up from behind, put his hand between Chavez's legs and grabbed his penis. Bravo was 5 to 10 feet away and saw the incident. Chavez looked at Bravo and said, "Can't we just work here?" Bravo laughed. So did Dominguez. Chavez felt humiliated. On a different day, Dominguez did the same thing. Once again, Bravo witnessed the incident, and once again he laughed.

On a separate occasion, while Chavez was retrieving materials from a bin in a work vehicle, Dominguez prodded Chavez's rectum with a broom handle. Dominguez laughed, and so did Bravo, Scribner and Mariscal. Chavez felt as if he "wasn't even a man no more." Subsequently, Dominguez repeated his broom handle attack on Chavez. The whole Redlands night crew witnessed it. Chavez felt like he "didn't want to live no more."

During the night shift starting on May 19, 2011, the Redlands night crew was working with the Foothill night crew in Palm Springs. Chavez was lying on the ground near an underground utility vault so he could transfer tools back and forth into the vault. He was working with Mariscal and a lineman from the Foothill night crew. After seeing Scribner approach, and after hearing Scribner call out sarcastically, "I am falling," Chavez felt the weight of a person on top of him and assumed it was Scribner. Specifically, Chavez felt contact between his buttocks and the other person's groin. At that point, Chavez said, "Get up. Get up. I can't breathe. Get up." Soon afterwards, Scribner said, "Hey, Kelly, come over here and get in on this." Chavez assumed Scribner was talking to Gulley.[3] About 10 or 15 seconds later, Chavez felt more weight on him. Next, as Chavez tried to get up, he felt a broom handle prod his rectum two or three times, and he heard Dominguez say something to the effect of, "come on, you know you

---

[3]      Gulley is a lineman for the Foothill night crew.

4

like this." Also, Chavez heard an unidentified person say, "everyone has got to get their cherry popped." Eventually, Scribner and the other person who was on top of Chavez got up and laughed.

On May 20, 2011, at 6:34 p.m., Dominguez sent Chavez a text message that said: "At Asahi eating." In response, Chavez texted back: "Aw, man, wish I could have went. [¶] Going to L.A. to pick up dog. Next time." When asked why he wrote that text message, Chavez testified that "I was just making up an excuse. I am not going." He further testified that "I really didn't want to associate with [Dominguez]."

Four days later, Bravo was not working and Scribner was the upgrade supervisor. After Scribner told Chavez to move a truck and he complied, Scribner walked up to Chavez and said, "Who the fuck . . . you think you are? You make me come and walk over to you. How dare you." This confrontation left Chavez feeling humiliated. He felt like "giving up on life." Later, Dominguez handed Chavez a rope and pulley. Chavez threw the rope down and said, "I am tired of this. I am tired of how you guys treat me. I can't do this no more." Dominguez replied, "Man, walk it off, man. You know, we all have to deal with [Scribner]." Chavez once again said he did not like how he was being treated on the crew, which prompted Dominguez to tell Chavez to walk into a nearby orange grove. Chavez did so, then came back. At some point that same night, Scribner approached Chavez knowing he was about to go on vacation. Scribner put his hands on Chavez's face and said, ["G]et your head out of your fucking ass. You are not on vacation yet." He proceeded to shake Chavez's head back and forth.

Over a week later, on June 3, 2011, Chavez sent Dominguez a text stating: "Hey, if you need anything, or help this weekend, let me know. My Bronco and my trailer [are] yours whenever you are ready for it."

To explain why he sent that text, Chavez testified: "Throughout my employment on the Redlands night crew, I felt if I could move quicker, if I could appease them, maybe they will stop the harassment."

Dominguez texted back: "Thank[s]. I will let you know[,]" and later, "Are you going to work?"

5

On June 6, 2011, Chavez felt suicidal. He spoke to Lorena Carrasco (Carrasco), his older sister who was a supervisor at SCE, and told her that he had been sexually assaulted. She advised Chavez to call SCE's ethics hotline, and to get treatment. Following Carrasco's directions, he called the ethics hotline. Because he had suicidal thoughts, he went to see his doctor. His doctor referred him to a therapist and placed Chavez on medical leave. Chavez began seeing Sheila Clark, PhD., a therapist, once a week.

On June 13, 2011, Dominguez asked via text if Chavez was going back to work. Five days later, on June 18, 2011, Chavez responded, stating: "I am doing better. I just got to the point where I was going to end my life. That's how much I hated work. I know looking back it was a dumb idea." When asked why he wrote that text message, Chavez testified: "Different reasons. I mean, one, to let him know what kind of damage he did to me. And another was just that I can't believe I was going to end my life over individuals like them."

To Chavez's June 18, 2011, text message, Dominguez replied: "I am glad I got to work with you. I miss you. See you soon. Get better and let me know if you need anything. Good night. Later. Sorry you had to go through that shit. Wish I could have helped out more."

As the last line in the chain of text messages, Chavez wrote: "At the end of the day, I look up to you. Man, I just wanted to be like you. And [know] my [stuff]." Chavez testified that when he wrote the text, he did not look up to Dominguez, and did not want to be like Dominguez.

During his medical leave, Chavez met with Mary Khalilieh (Khalilieh),[4] an investigator in SCE's ethics department, and recounted how he had been harassed. Dr. Clark wrote a note stating that Chavez "has a psychological work restriction that he cannot return to the Redlands Service Center or Foothill Service Center, as he is prohibited from contact with the sexual perpetrators."

---

[4] Previously, Khalilieh's last name was Batarseh.

Chavez's medical leave ended in October 2011. At about that time, he met with Khalilieh, who said she had finished her investigation, and she had concluded that there was sex harassment.

He wanted to transfer to Dominguez Hills. Instead, he was assigned to work in Victorville as a groundman in a temporary position. He had to commute at least an hour each way, which was much longer than his commute to Redlands, which was about 15 to 20 minutes each way. He was paid an additional $50 per day because of his commute. In his view, the Victorville position essentially lowered his compensation for two reasons. First, he was less likely to get overtime assignments. Second, he was spending $130 a week on gas for his car and changing the oil every three to four weeks.

While working in the Victorville assignment, he heard rumors than the linemen were calling him a rat because of the report he made to SCE's ethics department. On one occasion, he found a post-it note that said something to the effect of, "you are a rat," or "shut up rat." Chavez came into contact with the Foothill and Redlands night crews on multiple occasions each month, and he heard rumors that some of his harassers had been coming into the "yard" at the Victorville location. He spoke to Roger Heldoorn (Heldoorn), the district manager, about the rumors that Chavez was being called a rat, but Heldoorn said it was just "scuttlebutt." After a second meeting with Heldoorn, Chavez was told SCE wanted to transfer him to Dominguez Hills. Chavez said he did not want to transfer, and Heldoorn got upset. He said that if Chavez remained in the Victorville assignment, "I am not always going to be there for you. I can't always protect you."

Sometime in the beginning of 2012, Chavez began to see Dominguez and Gulley at work three to four times a month at the Victorville location while they worked as groundmen in "Prefab." Chavez told Jerry Wells (Wells), a supervisor, that he felt uncomfortable being around Gulley and Dominguez, and then Chavez asked if he could hide in his car when Gulley and Dominguez came into the yard. Wells gave Chavez permission. On more than five occasions, Chavez hid in his car when Gulley or Dominguez appeared.

At trial, Chavez was asked the following series of questions about Gulley. "With respect to [Gulley], did [he] ever say anything to you during your employment at [SCE] that you found to be offensive?" "Did [Gulley] ever say anything to you that you found to be threatening?" "Did [Gulley] ever say anything to you along the lines of, you better not complain about what happened on May 19[, 2011,] or something bad will happen to you, or words to that effect?" "Did you have any negative interactions with [Gulley] prior to May 19, 2011?" "And have you had any negative verbal altercations with [Gulley] after May 19, 2011?" "In other words, has [Gulley] said anything to you since this May 19, 2011, incident, that you found to be offensive or inappropriate?" "Has [Gulley] ever touched you [directly] in a manner that you felt was offensive?" "In other words, have you ever felt his hands on any part of your body, on . . . your groin, for example?" To each of these questions, Chavez had the same response. He answered, "No."

*Dominguez's Testimony*

Dominguez considered Chavez a workplace friend, and cared for him. At one point, they exchanged gifts. Dominguez gave Chavez a pocket knife to use when cutting and opening things at work, and Chavez gave Dominguez a military backpack. They spent time alone during drives between Redlands and Palm Springs for assignments. During those drives, they talked about their family lives and other personal matters. One day at work, Chavez was upset and Dominguez asked why. He put his arm around Chavez, and Chavez began to cry. Dominguez said, "It will be okay." Chavez then revealed that his wife had to get some cancer tests because cancer ran in her family. Dominguez said that was "horrible." He revealed that his wife once had endometriosis, and that had been a difficult time for him. Dominguez told Mariscal about Chavez's wife, and they stopped the job out of concern for Chavez so Dominguez and Chavez could talk further.

One day in Palm Springs, Dominguez and Chavez saw a man with long hair drive up to a jobsite. Chavez brought it to Dominguez's attention that the man with the long hair was cute. Dominguez asked Chavez, "Are you turning gay on me?" He said no, and

8

they laughed. When asked if he used the words "gay" or "faggot," Dominguez said: "I did use those words to describe things. That's gay. That's retarded. I would say things like that to describe poor craftsmanship or things that were really out of the ordinary, I guess."

Counsel for Chavez read a portion of Dominguez's deposition in which he said he called Chavez a "faggot" one time while in Palm Springs. Then counsel asked Dominguez if he ever called Chavez a "faggot." Dominguez responded, "Not to my knowledge."

When asked if he ever touched Chavez's buttocks with a broom, Dominguez testified as follows: "I kind of made a game to get the material out, to go and get . . . the tools out in a fast manner to open a vault so we could inspect it. . . . And it was kind of a hurry thing. And . . . we would race. And I beat him this particular time. And . . . as I went by, I goosed him with the broom and said, 'Whoa,' and kind of kept going and completed the task." Chavez did not say anything. That was the only time Dominguez touched Chavez with a broom.

Dominguez was asked if he ever touched Chavez's crotch or penis. He replied, "Yes, I have, on one occasion." Queried about this, Dominguez stated: "We were working, . . . looking inside of an underground structure, and we both were leaned over. And I asked him a question about the job, and he answered correctly. And I was excited, because he showed enthusiasm. And I went to slap his chest, and I hit him in the crotch. And I kind of just ignored it, and we . . . kept going. I said, 'Good job. Way to go.' I didn't give it any thought. Otherwise[,] it was an accident."

Regarding the events of the May 19, 2011, shift in Palm Springs, Dominguez testified that he recalled seeing the crew members in a pile on the ground. He poked the pile with a broom and asked what they were doing. He did not see who was in the pile when he poked it, nor did he look at where he was poking the broom handle when he did so. When the Redlands night crew finished the shift the next morning on May 20, 2011, the entire crew, including Dominguez and Chavez, ate breakfast at a Mexican restaurant. Together, Dominguez and Chavez then drove from Palm Springs back to Redlands.

9

The last time Dominguez saw Chavez was on the Redlands night crew, Chavez said, "I am going to get that fucker.  I am going to get that fucker back."  Dominguez assumed Chavez was talking about Scribner.

When Dominguez was asked why Chavez offered the use of his Bronco and trailer via text message, Dominguez said that he and his wife went through hard times, lost their house and had to move out.

*Gulley's Testimony*

During the May 19, 2011, shift, according to Gulley, he lost his footing on a vault lid, tripped and fell on Scribner.  At the time, Chavez was on his stomach.  Scribner was kneeling next to Chavez and giving him assistance.  As a result, Scribner landed on top of Chavez.  Prior to that happening, Gulley never heard Scribner say, "Hey, Gulley, come over here," or anything else to that effect.

According to Gulley, "I landed on Scribner with my hands and pushed off of Scribner to get . . . up off."  Gulley testified that he was on top of Chavez for one or two seconds, and he did not think he touched Chavez.

*Bravo's and Scribner's Testimony About Working With Chavez*

According to Bravo and Scribner, it was common to hear swear words while working on the Redlands night crew, and Chavez never complained.  Though Scribner used the word "gay," he never directed it at anyone.  He used the term to refer to a job that was not set up right, or to a location that had not been prechecked.  Bravo never heard anyone call Chavez a "fucking faggot", and he never saw Dominguez grab Chavez's groin or prod his buttocks with a broom handle.  Further, Chavez never complained that he had been inappropriately touched.  If Bravo had heard or seen such things, he would have immediately reported them to his supervisor.

When Chavez was not performing a task correctly, Bravo heard crew members say to Chavez, "What the 'F' are you doing?" or "What the hell are you doing?"  Asked if Bravo heard Chavez use profanity, Bravo testified, "Whenever horseplaying, I would hear them both say things back and forth to each other."  To Bravo, horseplay meant "[g]oofing around, not concentrating on the task at hand, or possibly just slapping each

10

other on the back or grabbing each other's arms or slapping each other on the butt." Chavez engaged in that behavior with the crew, and he never complained about it.

*Bravo's Testimony Regarding SCE Policies*

During examination by Chavez's counsel, Bravo was shown SCE's Policy No. 801 relating to Equal Employment Opportunity and then asked if he recognized it. He said, "I don't recall it. No, I do not." He was asked if he received training on that policy. Before he could respond, SCE's counsel objected and the objection was sustained. Bravo was asked about another document, and if he recognized it. He said, "It might have been in a book . . . , but I don't recall. I can't say that I have actually read it."

On redirect, SCE's counsel asked, "A moment ago, counsel for [Chavez] put a couple different documents up on the screen, and you did not recognize those sitting here today, without reading through them; correct?" In reply, Bravo stated, "Correct." Counsel continued with a follow up, asking, "But were you aware that [SCE] has policies in place with respect to the prevention of harassment and discrimination in the workplace?" Bravo replied, "Yes. . . . It is under the foreman's responsibility." He also said he was aware that SCE had policies to prevent violence in the workplace.[5]

*Khalilieh's Testimony*

Khalilieh interviewed Chavez twice. Among other things, Chavez told Khalilieh that Dominguez had texted to say he was sorry for what happened, but Chavez did not disclose any other text messages. In addition, Khalilieh interviewed Bravo and took

---

[5] In his reply brief, Chavez states that Bravo admitted "at trial that he could not identify SCE's written policies on 'equal employment opportunity' and 'against inappropriate sexual conduct, including sexual harassment,' and could not recall having ever been trained about their requirements during his employment (including in his capacity as a supervisor) at SCE." There is no support in the portion of the reporter's transcript cited by Chavez suggesting that Chavez never received training regarding sex harassment. That said, for two reasons, we accept Chavez's representation that Bravo was shown SCE's policy against sex harassment. From the context clue of the subsequent questions asked by SCE's counsel, we presume that either the equal employment opportunity policy, or the second document, contained SCE's policy regarding sex harassment. In addition, SCE has not objected to Chavez's representation about what Bravo was shown.

11

handwritten notes. According to Bravo, as set forth in Khalilieh's notes, crew members would engage in "gay communication with each other[.]" Bravo heard crew members call Chavez gay, and Chavez would say, "Yeah, I am gay." At one point in her notes, Khalilieh wrote: "[Bravo] felt it was getting out of hand and it was going to lead into physical abuse. May turn physical because they would grab each other's shoulders or hug from behind. E.g.[,] [Dominguez] would hug [Chavez] from behind and say[,] 'I love you.'" As represented by Bravo, he told the crew to stop "goofing around."

After interviewing various other people, Khalilieh generated a report. She found that Dominguez, Gulley and Scribner "engaged in intentional physical intimidating and targeted behavior that was unsafe for their work environment," and it was not an accident that Scribner and Gulley ended up on top of Chavez. In a section of the report entitled "Conclusions," she wrote: "The amount of time Mr. Scribner and Mr. Gulley were on top of Mr. Chavez may have been less than what Mr. Chavez reported. However, they were on top of Mr. Chavez at least long enough for Mr. Dominguez to hear laughter from others, turn around, poke at Mr. Chavez three times, and walk away while they were still on top of Mr. Chavez. [¶] These undisputed facts invalidate Mr. Scribner and Mr. Gulley's statements that this was an accident and they were . . . on Mr. Chavez for mere seconds." For reasons she could not explain at trial, Khalilieh omitted from the report Bravo's concern that the conduct between the crew members might lead to physical abuse. She found violations of SCE policies regarding accident prevention, equal employment opportunity, and inappropriate sexual conduct and sexual harassment.

An unidentified person authored an executive summary of Khalilieh's report and stated: "Reporting party . . . groundman assigned to the Redlands Service Center reported that 3 T.D.B.U. linemen sexually harassed him. The reporting party reported that while working out in the field and lying in a prone position, two linemen sat on top of [reporting party], simulating sexual intercourse, while the third lineman poked at his rectum with a broom over the [reporting party's] clothing. [¶] This incident was reported by three employees in three separate help line reports. This matter was assigned to the Ethic and Compliance Office for investigation. The investigation substantiated the

12

allegations. Appropriate corrective actions were taken and the matter was closed." Khalilieh said that the executive summary accurately described the disposition of her investigation. However, she did not substantiate the allegation that perpetrators had simulated sexual intercourse. Moreover, she had concluded that Gulley did not sexually harass Chavez.

*Ramiro Cervantes's Testimony*

Ramiro Cervantes (Cervantes), a district manager, testified that he disciplined Scribner on more than one prior occasion after he repeatedly violated SCE policies designed to protect the safety of the public. Each time, Cervantes expected Scribner to improve his performance. At one point, Cervantes issued a last chance letter. None of the discipline involved sexual assault, sex harassment or anything involving physical violence with a coworker.

*Edward Antillon's Testimony*

An SCE senior manager named Edward Antillon (Antillon) testified that he and another manager decided what discipline to impose on the crew members who had violated SCE policy. They decided to terminate Scribner's employment and suspend Dominguez and Gulley for 20 days. Per Antillon, Dominguez and Gulley were suspended rather than terminated because they had long employment histories and no discipline in their files.[6]

**The Jury Instructions**

Plaintiff submitted a proposed special jury instruction regarding sex harassment. It stated: "To establish that he was subjected to sexual harassment under the FEHA, Mr. Chavez need not show that his harassers' conduct was motivated by sexual desire. Rather, Mr. Chavez can demonstrate that he was sexually harassed if his harassers used his sex or engaged in sexual conduct against him as a weapon to create a hostile work environment."

---

[6] The evidence showed that Dominguez had been suspended twice by SCE.

13

SCE proposed its own special jury instruction, which stated: "In a case alleging same-sex sexual harassment, Chavez must show that: [¶] (1) Each defendant was motivated by sexual desire; or [¶] (2) Each defendant was motivated by a general hostility toward men in the workplace; or [¶] (3) Each defendant was attempting to punish Chavez for failing to comport with gender stereotypes."

The trial court gave both instructions.[7]

**The Judgment**

Pursuant to a special jury verdict, the jury found in favor of SCE, Dominguez and Gulley on all causes of action. Though the jury did not find liability in connection with the cause of action for intentional infliction of emotional distress, it found that Dominguez's and Scribner's conduct was outrageous, and that Scribner intended to cause Chavez emotional distress. The jury found Scribner liable for assault and battery and awarded Chavez $25,000 as a result. Judgment on the special jury verdict was entered accordingly.

This timely appeal followed.[8]

---

[7] According to Chavez, he objected to SCE special instruction. He points out that after the jury was instructed, and after the parties gave their closing arguments, the trial court allowed counsel to state the following on the record: "We had discussed in chambers, in connection with the jury charge, a couple of items, and I just wanted to make a record of [Chavez's] objections. [¶] On special instruction No. 30, proposed by counsel for defendant Scribner, we object to that as an inaccurate statement of the law, as to what must be shown to demonstrate same sex harassment." In our view, this was not an objection to SCE's proposed special jury instruction unless it was the same as Scribner's proposed special jury instruction. The appellate record does not contain Scribner's special jury instruction No. 30, so we cannot do a comparison. In any event, absent invited error, all instructions given are deemed excepted to pursuant to Code of Civil Procedure section 647. For purposes of jury instructions, the failure to object does not constitute either waiver or invited error. (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 705, 706.)

[8] Scribner did not file a respondent's brief. This is not treated as a default. "When no respondent's brief is filed, we "'examine the record on the basis of appellant's brief and . . . reverse only if prejudicial error is found. [Citations.]'" (*In re Ryan K.* (2012) 207 Cal.App.4th 591, 596, fn. 9.)

14

## DISCUSSION

### I.  Standard of Review.

Whether a jury was properly instructed is a question of law subject to our de novo review.  (*Romine v. Johnson Controls, Inc.* (2014) 224 Cal.App.4th 990, 1000.)  If the trial court erred, we will reverse only "'where it seems probable' that the error 'prejudicially affected the verdict.'  [Citations.]"  (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 (*Soule*).)  Thus, "we must examine the evidence, the arguments, and other factors to determine whether it is *reasonably probable* that instructions allowing application of an erroneous theory actually misled the jury.  [Citations.]"  (*Id.* at p. 581, fn. 11.)  In addition, we are required to "assume the jury might have believed the evidence favorable to the appellant and rendered a verdict in appellant's favor on those issues as to which it was misdirected.  [Citations.]"  (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 846; *Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 674 (*Henderson*) [court must assume that "'jury might have believed the evidence upon which the instruction favorable to the losing party was predicated, and that if the correct instruction had been given upon that subject[,] the jury might have rendered a verdict in favor of the losing party'"].)

With respect to the issue of prejudice, the SCE Defendants urge us to apply the substantial evidence test applicable to appellate review of a trier of fact's findings.  In other words, they contend that even if the trial court gave an erroneous instruction, we must nonetheless affirm if the jury's verdict was supported by substantial evidence.  As we have explained above, we must assume the jury might have believed the evidence that supported a finding of liability had the jury been properly instructed.  Thus, we do not accede to the SCE Defendants' urging.  Neither the holding of *Faigin v. Signature Group Holdings, Inc.* (2012) 211 Cal.App.4th 726, 736 ["We review findings by the trier of fact under the substantial evidence standard"] nor the holding of *Teraso Del Valle Master Homeowners Assn. v. Griffin* (2011) 200 Cal.App.4th 619, 634 ["We review a jury's findings of fact under the deferential substantial evidence standard"], both cited by the SCE Defendants, apply to appellate review of instructional error.

15

## II. Appeal Not Barred.

Based on *Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000 (*Transport Insurance*), the SCE Defendants point out that a party cannot appeal the giving of an instruction he requested. Because Chavez's special jury instruction was given, the SCE Defendants argue that Chavez cannot appeal. This argument is misplaced. Chavez is appealing the giving of SCE's special jury instruction, not the giving of his own special jury instruction.

As an alternative argument, the SCE Defendants contend that Chavez is estopped from raising the issue of instructional error because the instruction he proposed failed to explain the meaning of "using sex as a 'weapon.'" Erroneously, they rely on *Transport Insurance*. It stated that in a civil case, each party must propose complete and comprehensive instructions in accordance with his theory of the case. If a party fails to do so, the trial court has no duty to instruct on its own motion. Thus, before an appealing party complains of the failure to instruct on a particular issue, the party must show that he requested the proper instruction.[9] (*Transport Insurance*, *supra*, 202 Cal.App.4th at p. 1008.) The SCE Defendants' argument must be rejected because Chavez is appealing the giving of SCE's proposed jury instruction, not the failure to explain "using sex as a 'weapon.'"

## III. Jury Erroneously Instructed.

A trial court properly instructs the jury if the instructions "'embrace all points of law necessary to a decision.' [Citation.] 'A party is not entitled to have the jury instructed in any particular fashion or phraseology, and may not complain if the court correctly gives the substance of the applicable law.' [Citation.] [¶] When a party challenges a particular jury instruction as being incorrect or incomplete, 'we evaluate the instructions given as a whole, not in isolation.' [Citation.]" (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.)

---

[9] The failure of a trial court to give an instruction that was never requested does not qualify as a matter deemed excepted to under Code of Civil Procedure section 647. Thus that statute does not conflict with *Transport Insurance*.

We now turn to the law applicable to Chavez's claim.

Following the lead of federal cases applying Title VII, our Supreme Court has held that when a plaintiff employee sues on a hostile work environment sex harassment claim under FEHA, the claim has merit if he or she "was subjected to sexual advances, conduct or comments that were (1) unwelcome [citation]; (2) because of sex [citation]; and (3) sufficiently severe or pervasive to alter the conditions of [his or her] employment and create an abusive work environment [citations]." (*Lyle v. Warner Brothers Television productions* (2006) 38 Cal.4th 264, 279 (*Lyle*).)

To prove that harassment is because of sex, a FEHA plaintiff must show that gender was a substantial factor in the harassment, and that he or she would not have been treated in the same manner if he or she were the opposite gender. (*Lewis v. City of Benicia* (2014) 224 Cal.App.4th 1519, 1525 (*Lewis*).)

Case law establishes that a cause of action for sex harassment may be stated by a member of the same gender as the harasser. The plaintiff need not prove that the same gender harasser was motivated by sexual desire, only that the plaintiff was subjected to harassment because of sex. (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1239 (*Taylor*); *Oncale v. Sundowner Offshore Services* (1998) 523 U.S. 75, 79–80 (*Oncale*) [analyzing same gender sex harassment under Title VII].) Section 12940, subdivision (j)(4)(C) specifically provides that "[s]exually harassing conduct need not be motivated by sexual desire." In Title VII cases, which California courts "frequently seek guidance from" (*Lyle*, *supra*, 38 Cal.4th at p. 278), it has been stated that "'[s]o long as the environment was hostile to the plaintiff because of [his] sex, why the harassment was perpetrated (sexual interest? misogyny? personal vendetta? misguided humor? boredom?) is beside the point.' [Citation.]" (*Rene v. MGM Grand Hotel, Inc.* (9th Cir. 2003) 305 F.3d 1061, 1066 (*Rene*).)

*Oncale* noted that there are various scenarios that could support an inference that same gender harassment was because of sex, including: the same gender harasser is homosexual and makes explicit or implicit proposals of sexual activity; a person is harassed in such sex-specific and derogatory terms by a same gender person that it is

apparent that the harasser is motivated by hostility toward the presence of people of his or her same gender in the work place; and comparative evidence establishes that in a mixed-gender workplace, the harasser treated members of his or her gender with hostility. (*Oncale*, *supra*, 523 U.S. at pp. 80–81; *Lewis*, *supra*, 224 Cal.App.4th at p. 1525.) These scenarios are not, however, "the exclusive means of establishing the inference. [Citations.]" (*Id*. at p. 1526.) As explained more than 20 years ago, "The focus of a cause of action brought pursuant to [FEHA] is whether the victim has been subjected to sexual harassment, not what motivated the harasser." (*Mogilefsky v. Superior Court* (1993) 20 Cal.App.4th 1409, 1418.)

Here, the trial court incorrectly instructed on sex harassment because it limited liability for same sex harassment to cases in which the harassers were motivated in one of the three following ways: (1) the harassers were motivated by sexual desire; (2) the harassers were motivated by general hostility toward men in the workplace; or (3) the harassers were attempting to punish the plaintiff for failing to comport with gender stereotypes. In essence, the trial court added a requisite motivation element to Chavez's sex harassment claim.

*Singleton v. United States Gypsum Co.* (2006) 140 Cal.App.4th 1547, 1564 (*Singleton*) bolsters the conclusion that the trial court gave an erroneous instruction. Citing *Oncale*, the defendant in *Singleton* argued that the plaintiff had to "prove 'one of three propositions' in order to recover. . . . : '(1) that the harasser's conduct constituted an earnest sexual solicitation; (2) that the alleged harasser displayed a general hostility to males in the workplace; or (3) the alleged harasser treated men and women differently.'" (*Singleton*, *supra*, at p. 1562.) The court rejected this argument, observing that "a fair reading of *Oncale* leads one to conclude that the court rejected narrowly defined categories of same-gender sexual harassment[.]" (*Ibid.*) The *Singleton* court went on to conclude that summary judgment should have been denied because there was a triable issue as to whether the sexually explicit and offensive comments made by coworkers to the plaintiff constituted same gender sex harassment. Notably, the evidence favorable to the plaintiff showed that the harassers targeted the plaintiff's "identity as a heterosexual

man as a tool of harassment." (*Id*. at p. 1562.) And according to the court, "[s]exual harassment occurs when . . . sex is used as a weapon to create a hostile work environment." (*Id*. at p. 1564.) Significantly, in *Singleton*, the harassers' motivation did not fall within any one of the three categories promoted by the SCE Defendants here. Rather, as analyzed by *Singleton*, one harasser's "motive was that he was angry with [the plaintiff] for having reported him, and for having spoken disparagingly of [the harasser's] skills. [The other harasser] appear[ed] to have been [the first harasser's] camp follower. What took place between [the harassers and the plaintiff] was not 'male-on-male' horseplay [citation][,] but the acting out . . . of [the harassers'] anger and rage at [the plaintiff]." (*Id*. at p. 1564.)

The other instructions given at Chavez's trial did not cure the error.

Prior to giving the two proposed special jury instructions on sex harassment, the trial court instructed, inter alia:

"[Chavez] claims that [he was] subject . . . to harassment, based on his sex [at SCE], causing a hostile or abusive work environment. To establish this claim, [Chavez] must prove," he was subjected to unwanted harassing conduct because he was male; the harassing conduct was severe or pervasive; a reasonable man in his circumstance would have considered the work environment to be hostile or abusive; he considered the work environment hostile or abusive; he was harmed; and the conduct was a substantial factor in causing his harm.

"Harassing conduct may include" verbal harassment, "such as obscene language, demeaning comments, slurs or threats," or physical harassment, "such as unwanted touching, assault, or physical interference with normal work movement." "In order to find that [Chavez] was harassed, you must find that he was harassed based upon his gender."

After the trial court gave SCE's proposed special jury instruction on sex harassment, the trial court added, inter alia, these instructions:

"In determining whether unlawful harassment occurred, you must carefully consider the social context in which the alleged behavior occurred. For example, a

19

professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttock as he heads out onto the field, even if the same behavior would reasonably be experienced [severely or pervasively abusive] by the coach's secretary back at the office. The real social impact of workplace behavior often depends upon a constellation of the surrounding circumstances, expectations, and relationships, which are not fully captured by a simple recitation of the words used or the physical acts performed.

"'Severe or pervasive' means conduct that alters the conditions of employment and creates a hostile or abusive work environment. [¶] And in determining whether the conduct was severe or pervasive, you should consider all the circumstances. You may consider any and all of the following:" the nature of the conduct; how often, and over what period of time, that the conduct occurred; the circumstances under which the conduct occurred; whether the conduct was physically threatening or humiliating; and the extent to which the conduct unreasonably interfered with an employee's work performance.

None of these instructions negated the special instruction improperly limiting same gender sex harassment to situations in which the harassers harbored one of three specified motivations. And even though, per Chavez's special jury instruction that tracks *Singleton*, the jury was told that he could establish sex harassment by demonstrating that "his harassers used his sex as a weapon to create a hostile work environment," that instruction, like all the others, was also qualified, i.e., Chavez still had to prove the existence of one of the three specified motivations. Thus, the jury was not properly instructed on the applicable law.

## IV. Error Prejudicial as to Sex Harassment Claims Against Dominguez and Scribner.

Upon review, we conclude that the giving of SCE's special jury instruction regarding same gender sex harassment was prejudicial as to Chavez's claims against Dominguez and Scribner. If the jury had been properly instructed, and if it had believed

20

the evidence favorable to Chavez's claims, there is a reasonable probability that the jury would have found liability.

It is unlawful for "any . . . person, because of . . . sex . . . to harass an employee[.]" (§ 12940, subd. (j)(1).)  Harassing conduct includes but is not limited to "[v]erbal harassment, e.g., epithets, derogatory comments or slurs" and "[p]hysical harassment[.]" (Cal. Code Regs., tit. 2, § 11019(b)(1)(A) & (B).)  Physical touching is generally considered more offensive than mere words.  (*Sheffield v. Los Angeles County* (2003) 109 Cal.App.4th 153, 161.)  "Loss of tangible job benefits shall not be necessary in order to establish harassment."  (§ 12940, subd. (j)(1).)  For sex harassment to be actionable, it must alter the terms of employment and create an abusive work environment.  (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 608 (*Fisher*).)  "'[W]hile an employee need not prove tangible job detriment to establish a sex[] harassment claim, the absence of such detriment requires a commensurately higher showing that the [sex harassing] conduct was pervasive and destructive of the working environment.' [Citation.]"  (*Id*. at p. 610.)  However, the harassing "conduct need not seriously affect an employee's psychological well-being to be actionable as abusive work environment harassment.  [Citation.]  So long as the environment reasonably would be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious.  [Citation.]"  (*Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 412 (*Kelly-Zurian*) [declining to follow a contrary statement in *Fisher* because *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 22 (*Harris*) clarified that psychological injury is not necessary in Title VII cases].)  The public policy behind the rule in Title VII cases—which we look to for guidance in FEHA cases—is explained by the *Harris* court thusly:  ". . . Title VII comes into play before the harassing conduct leads to a nervous breakdown.  A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.  Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it

21

created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality." (*Harris*, *supra*, 510 U.S. at p. 22.)

According to Chavez, Dominguez and Scribner would say to him "[y]ou fucking faggot" on almost a daily basis. On two occasions, Dominguez grabbed Chavez's penis. On two other occasions, Dominguez prodded Chavez in the rectum with a broom handle. Each time, Bravo laughed. Then, after Scribner and Gulley fell on top of Chavez, and Scribner brought his crotch into contact with Chavez's buttocks, Dominguez prodded Chavez in the rectum a third time and joked, "[c]ome on, you know you like this." Based on what Bravo told Khalilieh, crew members engaged in "gay communication with each other." He thought it was going to lead to physical abuse. Moreover, he had witnessed Dominguez hug Chavez from behind and say, "I love you." The conduct and comments of Dominguez and Scribner were unwelcome by Chavez, which is demonstrated by, inter alia, his testimony that he did not like his job after the harassment began, he felt humiliated and did not want to live anymore, and he eventually went on medical leave. (*Lyle*, *supra*, 38 Cal.4th at p. 279.) Chavez explained that his text messages with Dominguez were designed to appease, put him off or communicate emotional damage, and therefore the text messages would not have dictated a finding that Chavez consented to all the verbal and physical harassment meted out by Dominguez and Scribner.

Insofar as the alleged harassment occurred, it was because of sex. This is established because Dominguez and Scribner would not have engaged in what Bravo termed "gay communication" with Chavez, nor would they have called him a "fucking faggot" almost every day, if he had been a woman. Also, Dominguez could not have grabbed Chavez's penis. (*Lewis*, *supra*, 224 Cal.App.4th at p. 1525 [a plaintiff must show that gender is a substantial factor in the harassment, and that if the plaintiff had been the opposite sex, he would not have been treated in the same manner]; *Lyle*, *supra*, 38 Cal.4th at p. 280 ["it is the disparate treatment of an employee on the basis of sex— not the mere discussion of sex or use of vulgar language—that is the essence of a sexual harassment claim"].) Moreover, Dominguez's acts of prodding Chavez's rectum were

22

because of sex because he was called gay and the rectum is linked to gay sexuality. As explained in one Title VII case, "grabbing [and] poking . . . areas of the body linked to sexuality . . . is inescapably 'because of . . . sex.' [Citation.]" (*Rene*, *supra*, 305 F.3d at p. 1066 [among other actions, harassers grabbed plaintiff's crotch and poked their fingers in his anus through his clothing].) In the context of all the other harassment, Scribner's act of falling on top of Chavez was based on sex because he intentionally brought his crotch into contact with Chavez's buttocks.

To support a harassment claim, a work environment must be objectively and subjectively hostile or abusive. To be hostile or abusive, the harassment must be severe or pervasive. (*Lyle*, *supra*, 38 Cal.4th at pp. 283–284.) The severity of harassment must be examined from the perspective of a reasonable person in the plaintiff's position. The relevant factors to consider include the frequency of the harassment, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. (*Lyle*, *supra*, 38 Cal.4th at p. 283.) Harassment is pervasive if there is a "concerted pattern of harassment of a repeated, routine, or . . . generalized nature. [Citations.]" (*Id*. at pp. 283–284.)

Chavez was a groundman, and his job was to take direction from everyone else. As a matter of social context, Chavez had the least power in the Redlands night crew, a fact that could have only compounded his sense of despair and victimization if harassed. According to him, he was ridiculed when he lacked work-related knowledge, and Dominguez and Scribner engaged in a variety of verbal attacks, some of which attacked Chavez's sexual orientation on almost a daily basis. Moreover, when Dominguez and Scribner engaged in their verbal and physical attacks, Bravo did not intervene. To make matters worse, Bravo laughed when Dominguez engaged in physically harassing conduct such as grabbing and prodding Chavez.[10] Thus, the person who should have protected

---

[10] We recognize that the jury concluded that Dominguez did not commit battery or sexual battery. But that does not mean that the jury necessarily concluded that Dominguez did not grab or prod Chavez. The special jury verdict form required a finding of specific intent for those torts, and that specific intent element is not an element of a

Chavez found the harassment funny. In light of these circumstances, there was sufficient evidence for the jury to conclude that the harassment was pervasive. As to the claim against Dominguez, it was reasonably probable that the jury would have concluded that the sex harassment was severe because, in a four-month period and in conjunction with the verbal harassment, Dominguez grabbed Chavez's penis twice and poked him in the rectum on three occasions. The last incident occurred when Chavez was pinned down and in an utterly vulnerable position.

Beyond the foregoing, Khalilieh concluded that Dominguez and Scribner engaged in sex harassment. Also, we note that the jury specifically found that Dominguez and Scribner acted in an outrageous manner, and Scribner intended to cause Chavez emotional distress. These findings undermine the suggestions made in the SCE Defendants' appellate briefs that the jury made a credibility determination and rejected Chavez's story. It bears emphasis that to the degree the SCE Defendants have argued the substantial evidence test, implicitly or expressly, and to the degree they have argued that Chavez's evidence was suspect while their evidence was stronger and more worthy of credence, we have ignored those arguments because they do not target the applicable standard of review.

In addition, a parsing of the testimony of Bravo, Dominguez, Scribner and Khalilieh reveals that there was no dispute that swearing and words like "gay" were used in the workplace. Nor was there any dispute that Dominguez touched Chavez's crotch on one occasion and poked him in the buttocks with a broom handle on another occasion. On other matters, such as the context and circumstances of day-to-day life on the Redlands night crew as well as certain incidents, there were inconsistencies in the stories told by these witnesses. While Dominguez and Scribner admitted using the word gay, they said it was only used to describe things that were not prechecked, etc. Bravo,

---

cause of action for sex harassment. Notably, the jury found that Dominguez's conduct was outrageous but that he did not intend to cause Chavez emotional distress. Inferably, the jury's verdict hinged on Dominguez's state of mind rather than on whether he grabbed or prodded Chavez.

24

however, told Khalilieh that the crew engaged in "gay communication," that they were grabbing and hugging each other, and he thought "it was getting out of hand" and might "lead into physical abuse." Khalilieh concluded that Chavez's version of the May 19, 2011, incident had occurred, and that there were inconsistencies in the stories told by Scribner, Gulley and Dominguez. The jury may well have viewed the testimony of Bravo, Dominguez and Scribner as an attempt to cover up what really happened in the Redlands night crew. That is the best explanation for why the jury concluded that Dominguez and Scribner acted in a manner that was outrageous, and that Scribner intended to cause Chavez emotional harm.

Finally, we dispose of the notion advanced by the SCE Defendants that the jury was not misled. In support of their notion, they cite the following rule. "[W]hen deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule*, *supra*, 8 Cal.4th at pp. 580–581.) They point out that Chavez's counsel was not precluded from arguing that Dominguez and Scribner used sex as a weapon to create a hostile work environment, and that the jury did not ask for a read back of the jury instructions. The problem with these arguments is that this rule is inapposite. It specifically applies to instructional omission. And even if the rule was apposite, the rule is a nonexhaustive list of factors for us to consider.

Here, the salient point is that the trial court affirmatively and improperly added elements to Chavez's sex harassment claim. Indeed, the only the way the jury was not misled was if it ignored the trial court's erroneous instruction. But that is unknowable and, also, a reviewing court presumes that a jury followed a trial court's instructions. (*People v. Adams* (2014) 60 Cal.4th 541, 578.) Moreover, in our view, the improper instruction "was likely to mislead the jury and thus to become a factor in its verdict" (*Henderson*, *supra*, 12 Cal.3d at p. 670) because the instruction was a clear and explicit condition on a finding of liability. And where "it seems probable that the jury's verdict may have been based on the erroneous instruction[,] prejudice appears and [a reviewing

court] 'should not speculate upon the basis of the verdict.'" (*Robinson v. Cable* (1961) 55 Cal.2d 425, 428; *Krouse v. Graham* (1977) 19 Cal.3d 59, 78 [instruction on improper damages elements "probably misled the jury and affected its verdict"].) Here, in light of the fact that the jury concluded that Dominguez and Scribner engaged in outrageous conduct but nonetheless did not find sex harassment, it seems probable that the verdict was based on the erroneous instruction.

## V. Error Prejudicial as to Claim that SCE Failed to Take Immediate Corrective Action After Bravo Learned of the Sex Harassment.

The FEHA provides that "[h]arassment of an employee . . . by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (§ 12940, subd. (j)(1).) In conjunction with the FEHA, "'[s]upervisor' means any individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to direct them, or to adjust their grievances, or effectively to recommend that action, if, in connection with the foregoing, the exercise of that authority is not of a merely routine or clerical nature, but requires the use of independent judgment." (§ 12926, subd. (t).)

On appeal, the parties offer no argument as to whether Bravo was a supervisor for purposes of the FEHA, and this appears not to have been an issue at trial. A review of the jury instructions establish that the trial court did not instruct on whether Bravo was a supervisor, or whether it was the jury's task to make that determination. In closing argument, Chavez's counsel argued that SCE's supervisor, Bravo, was aware of the sex harassment. Counsel for SCE did not object. Nor did he argue to the contrary in his closing argument. We assume, as did the parties, that Bravo was a supervisor under the FEHA.[11]

---

[11] For purposes of the new trial, we express no opinion as to whether Bravo was an SCE agent or supervisor under the FEHA.

If Chavez's testimony is credited, then Bravo was aware of the sex harassment because he witnessed it. Moreover, he failed to take immediate corrective action. This supports a finding of liability for SCE. (§ 12940, subd. (j)(1); *Brady v. Department of Corrections Rehabilitation* (2008)158 Cal.App.4th 1612, 1630 [once an employer is informed of sex harassment, the employer must take adequate remedial measures]; *Doe v. Capital Cities* (1996) 50 Cal.App.4th 1038, 1046 [an employer is liable for harassment by a coworker "if the employer knew or should have known of the conduct and failed to take immediate corrective action"]; *State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1041 [employer can be liable for sex harassment based on a negligence standard].)[12]

## VI. Error Not Prejudicial as to Claim that SCE Failed to Take Reasonable Steps to Prevent Sex Harassment.

It is unlawful "[f]or an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." (§ 12940, subd. (k).) Chavez suggests that it is reasonably probable that the jury would have decided in his favor on his section 12940, subdivision (k) claim if the jury had been properly instructed. We disagree.

As a preliminary matter, we set forth a few of the statutes designed to help companies prevent sex harassment.

Every employer shall act to ensure a workplace free of sexual harassment by displaying a poster containing information relating to the illegality of sexual harassment. In addition, an employer must distribute either an information sheet provided by the

---

[12] Because the evidence regarding Bravo would be sufficient to trigger section 12940, subdivision (j)(1), we need not examine whether SCE's decision to transfer Chavez to the Victorville location was acceptable corrective action even though Dominguez went to that location multiple times a month and Chavez asked his supervisor if he could hide in his car on those occasions. Nor must we determine whether SCE was required to terminate Dominguez. On remand, Chavez is free to argue that SCE is liable for any perceived failure to take corrective action.

27

Department of Fair Employment and Housing (DFEH), or equivalent information prepared by the employer. (§ 12950, subd. (b).)

Subject to certain deadlines not relevant here, an employer having 50 or more employees shall provide at least two hours of classroom or other effective interactive training and education regarding sex harassment to all supervisory employees in California. "The training and education . . . shall include information and practical guidance regarding the federal and state statutory provisions concerning the prohibition against and the prevention and correction of sexual harassment and the remedies available to victims of sexual harassment in employment. The training and education shall also include practical examples aimed at instructing supervisors in the prevention of harassment, discrimination, and retaliation, and shall be presented by trainers or educators with knowledge and expertise in the prevention of harassment, discrimination, and retaliation." (§ 12950.1, subd. (a).)

"Notwithstanding subdivisions (j) and (k) of Section 12940, a claim that the" information sheet or information required by section 12950, subdivision (a) or the training and education required by section 12950.1, subdivision (a) "did not reach a particular individual or individuals shall not in and of itself result in the liability of any employer to any present or former employee or applicant in any action alleging sexual harassment. Conversely, an employer's compliance with this section does not insulate the employer from liability for sexual harassment of any current or former employee or applicant." (§§ 12950, subd. (d), 12950.1, subd. (d).)

Now we turn to Chavez's argument.

On appeal, he contends that there are two pieces of key evidence that demonstrate that SCE is liable under section 12940, subdivision (k). Neither piece of evidence supports liability.

According to Chavez, SCE failed to properly train Bravo regarding sex harassment. But the record does not support the proposition. At trial, Bravo was shown the SCE policy for equal employment opportunity. He testified that he did not recognize it. Next, he was asked if he received training on that policy. Counsel for SCE objected

28

to the question, and the objection was sustained. After that, Bravo was shown a different document he did not recognize. Tacitly, Chavez suggests that either the equal employment opportunity policy or the other document contained material on sex harassment. For purposes of this appeal, we accept that representation. When asked by SCE's counsel if he was aware that SCE had a policy in place to prevent harassment and discrimination in the workplace, Bravo said he did. None of this evidence establishes that Bravo did not receive training. Indeed, he never said one way or the other. Moreover, as established by section 12950.1, subdivision (d), Chavez must demonstrate more than lack of compliance with section 12950.1, subdivision (a) to establish liability under section 12940, subdivision (k).

Moving on, Chavez argues that SCE should be held liable because it failed to terminate Scribner after he repeatedly violated SCE policies that were in place to protect the safety of employees and the general public. However, he was never disciplined for sex harassment or physical violence with a coworker. In our view, the failure to terminate Scribner for actions unrelated to sex harassment did not violate SCE's duty under section 12940, subdivision (k).

## VII. Error Not Prejudicial as to the Sex Harassment Claim Against Gulley.

During the incident on the May 19, 2011, night shift, Gulley never spoke to or touched Chavez. All that is alleged against Gulley is that he fell on top of Scribner while Scribner was on top of Chavez. There is no basis to infer that what Gulley did was because of sex. Even if it was because of sex, it was not pervasive or "severe in the extreme," and it was therefore not actionable. (*Herberg v. California Institute of the Arts* (2002) 101 Cal.App.4th 142, 151; *Faragher v. City of Boca Raton* (1998 ) 524 U.S. 775, 788 [in Title VII case, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'"]; *Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 144–145 [three incidents in a five-week period, including the male defendant rubbing his arm on the female plaintiff's breast, not pervasive harassment]; *Ellison v. Brady* (9th Cir. 1991) 924 F.2d 872, 878 ["the required showing of severity or seriousness of the harassing conduct varies inversely with the

pervasiveness or frequency of the conduct"].)  As a result, we conclude that the instructional error did not prejudice Chavez with respect to his cause of action for same gender sex harassment against Gulley.

## DISPOSITION

The judgment is reversed in part and remanded for a new trial on Chavez's sex harassment claims against Dominguez and Scribner, and Chavez's claim against SCE for failing to take immediate corrective action under section 12940, subdivision (j)(1).  In all other respects, the judgment is affirmed.  Gulley is entitled to recover his costs on appeal from Chavez.  Chavez is entitled to recover his costs related to his appeal from the judgment entered in favor of Dominguez and Scribner.  As between Chavez and SCE, they shall bear their own costs.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, Acting P. J.
                    ASHMANN-GERST

We concur:


_____, J.
          MOSK


_____, J.
          HOFFSTADT

30